Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Cravens v. City of La Marque, Tex.
S.D.Tex.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Galveston
Division.
Marie CRAVENS, et al., Plaintiffs,
v.
CITY OF LA MARQUE, TEXAS, Defendant.
No. Civ.A. G-05-545.

Feb. 28, 2006.

Scot Gibbons Dollinger, Dollinger Law, Houston,
TX, for Plaintiffs.
William Scott Helfand, Chamberlain Hrdlicka,
Houston, TX, for Defendant.

*ORDER GRANTING DEFENDANT CITY OF LA
MARQUE'S MOTION TO DISMISS FOR FAILURE
TO STATE A CLAIM*

KENT, J.
**\*1** This case arises out of alleged misconduct by
former City of La Marque police officer Richard
Ontiveros ("Ontiveros"), who failed to take Abner
Cravens ("Cravens") into custody for driving while
intoxicated even though he allegedly had probable
cause to do so. Plaintiffs are Cravens's survivors and
representatives of the estate. They bring their claims
against the City of La Marque ("the City") under 42
U.S.C. § 1983 for alleged violations of Cravens's
constitutional rights. Now before the Court is the
City's Motion to Dismiss for Failure to State a Claim
pursuant to FED. R. CIV. P. 12(b)(6). For the reasons
stated below, the City's Motion is GRANTED, and
Plaintiffs' claims against the City are hereby
DISMISSED WITH PREJUDICE.FN1

> FN1. This Court does not consider this
> Order worthy of publication. Accordingly, it
> has not requested and does not authorize
> publication.

I. Background

Plaintiffs allege that Cravens was denied
substantive due process and equal protection under
the Fourteenth Amendment to the United States
Constitution. Plaintiffs claims are based on the
alleged misconduct of Officer Ontiveros, who at the
time of the events giving rise to this lawsuit was
employed as a police officer by the City. Plaintiffs
claim that the City is directly liable for the actions of
Officer Ontiveros based on its policies, customs, and
practices, which resulted in the violation of Cravens's
constitutional rights and resulted in his untimely
death. The tragic facts of this case are laid out below.
FN2

> FN2. Since this is a Motion to Dismiss, the
> Court must consider the facts as they have
> been presented by Plaintiffs. Accordingly,
> the Court has laid out the facts as alleged in
> Plaintiffs' Complaint, but makes no
> judgment as to their accuracy.

Plaintiffs allege that around 5:30 p.m., on or
about October 13, 2003, Cravens was driving his
vehicle in La Marque, Texas, when he rear-ended
another motor vehicle driven by Rosezelia Sonnier
("Sonnier"), who also happened to be his cousin.
After the accident occurred, Sonnier and others were
concerned about Cravens's well-being because he
appeared to be intoxicated, and they called the La
Marque Police Department. Police arrived at the
scene of the accident shortly thereafter, and Officer
Ontiveros conducted an investigation.FN3Plaintiffs
claim that Officer Ontiveros was advised at the scene
that Cravens was intoxicated and that he required
help, and that Officer Ontiveros knew that Cravens
was intoxicated based on his own personal
observations. Next, Plaintiffs claim that Officer
Ontiveros told Cravens's family and others that he
had the situation under control, that he would handle
the situation, and that their involvement "was no
longer needed, necessary, or allowed."As a result, all
of the people that would have helped Cravens left his
"well-being" in the hands of Officer Ontiveros.
Additionally, Plaintiffs claim that Officer Ontiveros
had probable cause to arrest Cravens for driving
while under the influence of alcohol, but instead,
released Cravens and allowed him to continue to
drive his vehicle in his intoxicated state, posing a
danger to himself and others.

> FN3. Plaintiffs do not mention any other La
> Marque police officers in their Complaint.

Shortly after Officer Ontiveros released Cravens,
he was involved in a second accident. Cravens
crossed the center line and ran head-on into
oncoming traffic. Cravens suffered injuries that
ultimately lead to his death several days later.
Plaintiffs allege that had Officer Ontiveros not told

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00021    Document 25-5    Filed 01/31/2008    Page 2 of 39

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

them that he had the situation under control, they would have made sure Cravens was driven from the scene and given proper medical care. Essentially, Plaintiffs claim that but for the actions of Officer Ontiveros, Cravens would still be alive.

**\*2** Plaintiffs originally filed suit against the City and Officer Ontiveros. That cause of action was dismissed on July 11, 2005 because Plaintiffs' Counsel failed to appear at the Rule 16 Scheduling Conference. On July 25, 2005, Plaintiffs moved to reopen the case as to Officer Ontiveros only. The Court granted that motion and the case was reopened as to Officer Ontiveros.[FN4] On October 12, 2005, Plaintiffs filed a separate suit against the City concerning the same events. On November 16, 2005, the City filed its Motion to Dismiss for Failure to State a Claim. After thoughtful consideration of the City's Motion, Plaintiff's Response thereto, and applicable law, the Court concludes that the City's Motion to Dismiss is hereby GRANTED.

FN4. Cause No. 3:05-cv-00222, *Cravens, et al. v. Richard Ontiveros.*

II. Motion to Dismiss for Failure to State a Claim

A party is entitled to dismissal under FED. R. CIV. P. 12(b)(6) when an opposing party fails to state a claim upon which relief may be granted. Rule 12(b)(6) dismissal is appropriate when it appears without a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994). When considering a motion to dismiss for failure to state a claim, the Court accepts as true all well-pleaded allegations in the complaint, and views them in the light most favorable to the plaintiff. *See Scanlan v. Texas A & M University,* 343 F.3d 533, 536 (5th Cir.2003); *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir.2000) (noting that a court must construe the complaint liberally in favor of the plaintiff).*See also Malina v. Gonzales,* 994 F.2d 1121, 1125 (5th Cir.1993)."A motion to dismiss under Rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Collins,* 224 F.3d at 498 (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982).

Although all doubts are resolved in the plaintiff's favor, a plaintiff still must plead specific facts to avoid dismissal for failure to state a claim; a court may not accept as true conclusory allegations or unwarranted deductions of fact contained within the plaintiff's complaint. *See Tuchman,* 14 F.3d at 1067;*Fernandez-Montez v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993)." '[A] statement of facts that merely creates a suspicion that the pleader might have a right of action' is insufficient."*Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir.1995) (quoting 3 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1216 at 163). Dismissal is appropriate if the complaint lacks factual allegations regarding required elements necessary to obtain relief. *Id.* (citing 2A MOORE'S FEDERAL PRACTICE ¶ 12.07 [2.-5] at 12-19 (footnote omitted)).

**\*3** Additionally, in considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings. *See Scanlan,* 343 F.3d at 536-37. In their Response, Plaintiffs invite the Court to consider briefs and exhibits that have been submitted in their lawsuit against Officer Ontiveros in his individual capacity. *See* Defendant's Motion for Summary Judgment, *Cravens, et al. v. Ontiveros,* Cause No. 3:05-cv-222. Those exhibits have no bearing on the Court's determination of the sufficiency of Plaintiffs' Complaint to state a claim for which relief can be granted against the City, and they will not be considered. Only in narrow circumstances are documents beyond the pleadings themselves considered by a court in ruling on a Rule 12(b)(6) motion. *See Scanlan,* 343 F.3d at 536-37. This case does not fall within those parameters, and the City's Motion to Dismiss will be based solely on the pleadings.

III. Analysis

A. 42 U.S.C. § 1983

42 U.S.C. § 1983 provides a cause of action for those who have been deprived of their federal rights under color of law. Section 1983 does not create any substantive rights, rather, it "simply provides a remedy for the rights that it designates."*Johnson v. Harris County Flood Control Dist.,* 869 F.2d 1565,

1574 (5th Cir.1989). The assertion of an underlying constitutional or federal statutory violation is a predicate to liability under § 1983. See *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir.1998). A municipality will only be held liable for the violation of a plaintiff's constitutional rights if the municipality's policies were the moving force behind the constitutional violation. See *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.2001) (*"Piotrowski II"*) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-94, 98 S.Ct. 2018, 2035-37, 56 L.Ed.2d 611 (1978)).

Plaintiffs premise their § 1983 claims upon the following constitutional violations: (1) violation of Cravens's substantive due process rights under the Fourteenth Amendment to the United States Constitution arising from a special relationship as established in the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Soc. Sevs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); (2) violation of Cravens's substantive due process under the Fourteenth Amendment to the United States Constitution arising under the state-created danger theory; and (3) violation of Cravens's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The sufficiency of Plaintiffs' claims against the City with respect to each alleged constitutional violation will be analyzed individually. Each analysis will require a two-part inquiry: (1) have Plaintiffs alleged facts which, if true, amount to a constitutional violation, and (2) have Plaintiffs alleged that a policy or custom of the City was the moving force behind the constitutional violation.

A. Substantive Due Process

**\*4** In general, municipalities are under no affirmative duty to provide protection to private citizens. "[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual."*Id. at 196, 109 S.Ct. at 1003.* "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."*Id. at 197,*109 S.Ct. 1004.However, there are exceptions. The Constitution imposes a duty to protect individuals in two limited circumstances: (1) when the state has a special relationship with a person; or (2) when the state exposes a person to a danger of its own creation

(a "state-created danger").See *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir.1995) (*"Piotrowski I"*) (citing *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir.1992)). Plaintiffs argue both that Officer Ontiveros created a special relationship with Cravens and therefore had a duty to protect him, and that Officer Ontiveros subjected Cravens to a state-created danger by cutting off a private source of aid.

1. Special Relationship

"[I]n certain limited circumstances, the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."*DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1004. This is known as the "special relationship" exception. Under this exception, the state has a constitutional duty to protect an individual from known threats of harm by private actors. See *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir.2004); *Priester v. Lowndes County*, 354 F.3d 414, 421-22 (5th Cir.2004). The affirmative duty only arises when the state acts to restrain an individual through incarceration, institutionalization or puts some other similar restraint on an individual's personal liberty by the affirmative exercise of state power such that he cannot act on his own behalf. See *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir.2002); *Walton v. Alexander*, 44 F.3d 1297, 1303-04 (5th Cir.1995).See also *DeShaney*, 489 U.S. 199-200, 109 S.Ct. at 1005-06.

Plaintiffs have failed to allege any facts in their Complaint that would support a cause of action under the special relationship exception. First, there is no allegation that Cravens was institutionalized, incarcerated or in any other way restrained his freedom. See *McClendon*, 305 F.3d at 324. In fact, it was Officer Ontiveros's *failure to arrest* is the keystone to Plaintiffs' claims. Cravens was only detained for the purpose of investigating the accident, and he was then permitted to drive away. In *Beltran v. City of El Paso*, the Fifth Circuit emphasized that the state actor must affirmatively place the individual into custody and restrain the individual's freedom for the special relationship exception to apply. See *Beltran*, 367 F.3d at 307 (finding that the actions of a 911 operator encouraging a caller to stay in the bathroom and telling her that police were on their way did not establish a special relationship or that the operator became the custodian of the caller's safety).

**\*5** Second, there is no allegation that Officer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Ontiveros prevented Cravens from acting on his own behalf. Officer Ontiveros merely let Cravens return to the activities in which he was engaged directly before coming into contact with the police. Whether Cravens could act on his own behalf given his alleged state of intoxication is irrelevant. Cravens's intoxicated state was due to his own voluntary actions, and his intoxication alone does not give rise to a special relationship with Officer Ontiveros. There was no special relationship between Cravens and Officer Ontiveros and therefore no constitutional violation. As such, there can be no claim against the City, for if a person has not suffered a constitutional injury, whether the City's regulations might have authorized the conduct is beside the point. *See Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986).* Plaintiffs claim against the City premised on the special relationship theory is hereby DISMISSED WITH PREJUDICE.

2. State Created Danger Under Substantive Due Process

The validity of the state-created danger theory is uncertain in the Fifth Circuit, which has repeatedly declined to recognize state-created danger as a trigger of affirmative duties under the Due Process Clause. *See Beltran, 367 F.3d at 307;Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 249 (5th Cir.2003).* However, on numerous occasions the Fifth Circuit has recognized and discussed the existence and elements of the doctrine, as well as its acceptance in other Circuits. *See id.;Scanlan, 343 F.3d at 538;Randolph v. Cervantes, 130 F.3d 727 (5th Cir.1997); Doe v. Hillsboro Indep. Sch. Dist., 113 F.3d 1412 (5th Cir.1997); Piotrowski I, 51 F.3d 512;Johnson v. Dallas Indep. Sch. Dist.,*38 F.3d 521 (5th Cir.1994). Additionally, the Circuit has discussed what a plaintiff would be required to show to prevail on such a theory. To survive Rule 12(b)(6) dismissal, a plaintiff must allege facts sufficient to show: (1) that the state actor increased the danger to the individual, and (2) that the state actor acted with deliberate indifference to the plight of the plaintiff. *See Rivera, 349 F.3d at 249;Scanlan, 343 F.3d at 537-38;Piotrowski I, 51 F.3d at 515.* "The key to the state created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of [his or] her ability to defend [himself or] herself, or cutting off potential sources of private aid."*Johnson,* 38 F.3d at 201 (quotations and citations omitted). In *Scanlan,* the

Circuit expressly noted that despite the theory's uncertain viability, a district court should treat such claims as valid on a motion to dismiss, and analyze them accordingly. *See Scanlan,* 343 F.3d at 538.

According to the facts as alleged, Officer Ontiveros prevented Cravens's cousin and others from rendering aid to Cravens at the scene of the first accident by telling them that "he had the situation in hand and that he would take care of the situation."By making representations that Cravens would be taken care of, he cut off a potential source of aid, and discouraged Cravens's family and others from looking out for the safety of Cravens. Plaintiffs claim that but for Officer Ontiveros's representations, Cravens's family and others would have intervened to see that Cravens arrived home safely. These facts, as alleged, demonstrate that by cutting off a potential source of aid, Officer Ontiveros created a situation where Cravens is in greater danger than he would have otherwise been.[FN5]

> FN5. The Court again notes that the facts alleged must be taken as true.

**\*6** Whether the facts support the second requirement, that Officer Ontiveros acted with deliberate indifference, presents a more difficult question. There is a significant distinction between a tort and a *constitutional* wrong. *See Lefall v. Dallas Ind. Sch. Dist., 28 F.3d 521, 532* (citing *de Jesus Benavides v. Santos,* 883 F.2d 385, 388 (5th Cir.1989)). The Supreme Court has made it clear that "[t]he Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property."*Davidson v. Canon, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).* Where a state actor is merely negligent in causing the injury, no procedure for compensation is *constitutionally* required. *Id.* Reckless and grossly negligent conduct by state officials falls squarely within the ambit of traditional state tort law. *See de Jesus Benavides, 883 F.2d at 388.* Accordingly, the conduct of a state actor does not violate a victim's right to substantive due process unless that conduct is carried out with deliberate indifference.

Deliberate indifference is a "lesser form of intent rather than a heightened form of negligence."*Lefall, 28 F.3d at 531* (internal quotations omitted). It involves a higher degree of certainty than gross negligence. *See Doe v. Taylor Indep. Sch. Dist.,*15

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

F.3d 433, 453 (5th Cir.1994)."Deliberate indifference requires that the state actor both knew of and disregarded an excessive risk to victim's health and safety."*Beltran, 367 F.3d at 307* (citing *McLendon, 305 F.3d at 326 n. 8).* Plaintiffs' argue that by failing to arrest Cravens when he was intoxicated *and* by cutting off private sources of protection, Officer Ontiveros acted with deliberate indifference toward the safety and well-being of Cravens. Plaintiffs rely upon a case from the Third Circuit, *Kneipp v. Tedder, 95 F.3d 1199 (3d Cir.1996),* for this argument. In that case, an intoxicated woman was walking home with her husband when the couple was stopped by police officers who later told the husband to go home.*Id. at 1201-03.*The husband left while his wife was resting on the hood of a police vehicle in the presence of several officers. After his wife did not return home, he went to look for her and came across the police officers he had been with earlier. When he asked about her whereabouts, an officer told him to "get out of here" before he was locked up. The husband left again upon the instruction of the officer. His wife was later found in a ditch where she suffered hypothermia causing permanent brain damage. In that case, the Third Circuit found that the plaintiffs had "adduced sufficient evidence to raise a material issue as to whether [the officers] had acted in willful disregard for [her] safety."*Id. at 1208.*The validity of *Kneipp* in this Circuit is far from certain. However, given the deference owed to a plaintiff on a motion to dismiss, the Court assumes without deciding that given the facts as alleged (that Officer Ontiveros knew that Cravens was intoxicated, permitted him to drive away from the scene of the accident *and* that he cut off private sources of aid), Plaintiffs have alleged sufficient facts to support their claim that Officer Ontiveros knew and disregarded an excessive risk to Cravens's safety.[FN6] Therefore, Plaintiffs have stated facts sufficient to show a constitutional violation by Officer Ontiveros under the state-created danger theory.[FN7]The next inquiry is whether the City's policies or customs were the "moving force" behind the alleged violation. If not, then Plaintiffs' claim against the City must fail as a matter of law.

FN6. The Court has doubts as to whether the act of allowing a drunk driver to continue driving after already committing one accident, and where people are offering to render him aid, actually amounts to deliberate indifference given the Supreme Court's recent decision in *Town of Castle*

*Rock, Colo. v. Gonzalez, --- U.S. ----, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005),* and the Fifth Circuit's decision in *Saenz v. Heldenfels Bros., Inc., 183 F.3d 389 (5th Cir.1999).* In *Castle Rock,* the Supreme Court recognized the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands."*Castle Rock, --- U.S. ----, 125 S.Ct. at 2805-06, 162 L.Ed.2d 658.* In *Saenz,* the Fifth Circuit found that "neither the text nor the history of the Due Process Clause supports holding that an officer who orders another officer to refrain from arresting a suspected drunk driver has committed a constitutional tort," and that a state officer "cannot offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public."*Saenz, 183 F.3d at 391, 392.* For the purposes of this Motion, and given the absence of any directly-controlling authority, the Court will assume that Officer Ontiveros's actions amounted to deliberate indifference. However, the Court also recognizes that this questions presents a difficult policy decision best left to the purview of the Fifth Circuit, and not a district court.

FN7. The Court notes that this conclusion is aided by the fact that on a motion to dismiss for failure to state a claim the facts as alleged must be construed in a light most favorable to the plaintiff and all facts as alleged are to be taken as true.

*7 In suits against a city, "a plaintiff must demonstrate that a [city] 'policy' was the 'moving force' behind the constitutional violation."*In re Foust, 310 F.3d 849, 861 (5th Cir.2002)* (citing *Brown v. Bryan County, Okla., 219 F.3d 450, 457 (5th Cir.2000)).* To prove a violative policy or practice, a plaintiff must show that "(1) the local government or official promulgated a policy; (2) the decision displayed 'deliberate indifference' and proved the government's culpability; and (3) the policy decision lead to the particular injury."*Id.* The Supreme Court has said that "locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

whose acts may fairly be said to be those of the municipality."*Board of County Comm'rs v. Brown,* 520 U.S. at 403-04 (citing *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611).

At this stage in the case, Plaintiffs do not need to prove a county custom or policy. Rather, they must allege facts which, if true, state a claim for which relief can be granted. Plaintiffs have failed to allege any facts showing that the allegedly unconstitutional action of Officer Ontiveros was carried out pursuant to the official policies and customs of the City. Plaintiffs essentially describe a "single incident" in which Officer Ontiveros exercised poor judgment. *See Campbell,* 43 F.3d at 977. There are no facts in the Complaint to support Plaintiffs' allegations of any of the following customs or policies on the part of the City: (1) failure to train police officers on their duties when confronted with intoxicated drivers; (2) failure to timely review and enforce the City's policies and procedures; (3) allowing discretion on arresting intoxicated drivers; and (4) allowing police officers to extend "special favors" to family members of law enforcement officers even when those "special favors" would result in failing to protect individuals such as Cravens and the public at large.[FN8]These are all conclusory allegations without any supporting facts. Furthermore, Plaintiffs' have failed to assert any facts which would show that any of these policies were the "moving force" behind Officer Ontiveros's decision not to arrest Cravens, or that Officer Ontiveros's poor decision on that evening was anything more than an isolated incident. For these reasons, Plaintiffs' claim against the City under the state-created danger theory is hereby DISMISSED WITH PREJUDICE.

> FN8. There are not even any facts indicating that Officer Ontiveros was granting anyone a "special favor" by failing to arrest Cravens.

**B. Equal Protection Claim**

The Equal Protection Clause requires similar treatment of all persons similarly situated. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). A party who wishes to make out an equal protection claim must prove the existence of purposeful discrimination motivating the alleged state action. *See Washington v. Davis,* 426 U.S. 229, 246-50, 96 S.Ct. 2040, 2051-52, 48 L.Ed.2d 597 (1976);

*Bryan v. City of Madison, Miss.,* 213 F.3d 267, 276 (5th Cir.2000); *Vera v. Tue,* 73 F.3d 604, 609-10 (5th Cir.1996). To establish a claim of selective law enforcement, a plaintiff must show that selective enforcement was deliberately based upon an unjustifiable standard, such as race or religion. *See Beeler v. Rounsavall,* 328 F.3d 813, 817 (5th Cir.2003).

**\*8** Plaintiffs assert that "[b]ut for [Cravens's] status as an African-American, Officer Ontiveros would have properly arrested [him] in order to protect him."The City argues that this claim is unsupported and conclusory. The Court agrees. There are no facts in the Complaint to support an equal protection violation. There are no facts supporting an inference that the decision not to arrest Cravens was based on race. There are no facts showing or even alleging that similarly situated individuals of other groups outside Cravens' class were arrested under the same circumstances, nor are there any facts to support any inference of purposeful discrimination on the part of Officer Ontiveros. Plaintiffs have failed to allege any facts supporting any theory of racial discrimination, bias, or prejudice, or that race had anything to do with Officer Ontiveros's decision not to arrest Cravens. The unsupported allegation merely creates a suspicion that Plaintiffs might have a right of action, and that alone is insufficient to survive a motion to dismiss for failure to state a claim. *See Campbell,* 43 F.23d at 975.

Additionally, the Fifth Circuit has noted that "the Equal Protection Clause should not be used to make an end-run around the *DeShaney* principle that there is no constitutional right to state protection for acts carried out by a private actor."*Beltran,* 367 F.3d at 304. A plaintiff cannot circumvent the rule of *DeShaney* with an unsupported allegation that a police officer exercised his discretion to arrest in one incident but not in another based on race. *See McKee v. City of Rockwall,* 877 F.2d 409, 413 (5th Cir.1989). Yet, this is exactly what Plaintiffs are trying to do. There are no alleged facts supporting the assertion that Officer Ontiveros selectively enforced the drunk driving laws on any impermissible ground. *See Woodard v. Andrus,* 419 F.3d 348, 354 (5th Cir.2005).

As such, Plaintiffs equal protection claim against the City must fail. If there is no constitutional injury at the hands of the police, then the question whether any departmental policies or customs might have

Not Reported in F.Supp.2d                                                            Page 7
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

authorized the conduct is moot. *See Los Angeles v. Heller, 475 U.S. at 799, 106 S.Ct. at 1573*. Plaintiffs' equal protection claim against the City is hereby DISMISSED WITH PREJUDICE.


IV. Conclusions

    Plaintiffs have failed to allege facts sufficient to support their claims against the City. For the reasons stated above, the City's Motion to Dismiss for Failure to State a Claim is GRANTED. All of Plaintiffs' claims against the City are DISMISSED WITH PREJUDICE. A Final Judgment will be issued contemporaneously with this Order. Each Party is to bear its own taxable costs, expenses, and attorneys' fees incurred herein to date.

    IT IS SO ORDERED.

S.D.Tex.,2006.
Cravens v. City of La Marque, Tex.
Not Reported in F.Supp.2d, 2006 WL 492805 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.2d)**

▷Doe I v. The Gap, Inc.
D.N.Mar.I.,2001.
Only the Westlaw citation is currently available.
District Court for the Northern Mariana Islands.
DOE I, et al., On Behalf of Themselves and All
Others Similarly Situated, Plaintiffs,
v.
THE GAP, INC., et al., Defendants.
**No. CV-01-0031.**

Nov. 26, 2001.

ORDER RE: MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT

MUNSON, J.

**\*1** THIS MATTER came before the Court on
August 10, 2001, for hearing on Defendants' Motion
to Dismiss Plaintiffs' First Amended Complaint
("FAC"). G. Patrick Civille, Albert H. Meyerhoff and
Michael Rubin appeared for plaintiffs. Gregory P.
Joseph, Daralyn Durie, Randolph J. Rice, and Angela
Padilla appeared on behalf of the retailer defendants.
Richard Pierce appeared on behalf of the
manufacturer defendants.

Upon consideration of the written and oral
argument of counsel, the Court GRANTS in part and
DENIES in part defendants' motion to dismiss as set
forth herein.

STANDARD FOR MOTION TO DISMISS

Defendants move to dismiss plaintiffs' claims
under Fed.R.Civ.P. 12(b)(6) for failure to state a
claim upon which relief can be granted. A Rule
12(b)(6) dismissal is proper only where there is either
a "lack of a cognizable legal theory" or "the absence
of sufficient facts alleged under a cognizable legal
theory."*Balistreri v. Pacifica Police Dept., 901 F.2d
696, 699 (9th Cir.1988).* In considering a motion to
dismiss for failure to state a claim, a court must
accept as true all material allegations in the
complaint, as well as reasonable inferences to be
drawn from them. However, a court need not accept
as true unreasonable inferences, unwarranted
deductions of fact, or conclusory legal allegations
cast in the form of factual allegations. *See
e.g.Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d
924, 928 (9th Cir.1994) (internal quotation omitted).

RICO CLAIMS

COUNT 1-VIOLATION OF AND CONSPIRACY
TO VIOLATE § 1962(c)

COUNT 2-VIOLATION OF AND CONSPIRACY
TO VIOLATE § 1962(a)

Defendants move to dismiss the RICO claims on
the following grounds: (1) plaintiffs have not
sufficiently alleged the existence of RICO
enterprises, (2) plaintiffs have not alleged injuries
that confer standing under RICO; and (3) plaintiffs
have not sufficiently alleged the retailer defendants'
participation in the conduct of the affairs of an
enterprise.[FN1]

> FN1. The parties are familiar with the facts,
> allegations, and legal arguments in this case.
> The court states only those which are
> necessary to explain its decision.

Existence of RICO enterprises

Plaintiffs' RICO claims under 18 U.S.C. §
1964(c) are based on violations of RICO § 1962(a)
and (c). To allege violations of § 1962(a) and (c),
plaintiffs must sufficiently allege the existence of an
enterprise. *See United States v. Cauble,* 706 F.2d
1322, 1331 (5th Cir.1983). An " 'enterprise' includes
any individual, partnership, corporation, association,
or other legal entity, and any union or group of
individuals associated in fact although not a legal
entity."18 U.S.C. § 1961(4). Defendants contend that
plaintiffs have not adequately alleged the existence of
a RICO enterprise.

Plaintiffs allege two types of RICO enterprises:
(1) many separate enterprises consisting of a single
retailer defendant associated in fact with a single
manufacturer defendant, and (2) one enterprise
consisting of all retailer defendants associated in fact
with all manufacturer defendants. Plaintiffs allege
that the various association-in-fact enterprises were
formed for the purpose of committing numerous acts
of racketeering activity.

Association-in-fact enterprises consisting of
individual retailer defendants and individual
manufacturer defendants have been adequately
alleged.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** In *United States v. Turkette,* 452 U.S. 576, 582-583 and n. 4, 101 S.Ct. 2524, 2528 and n. 4 (1981), the Supreme Court stated that an association-in-fact enterprise is a group of persons associated for the common purpose of engaging in a course of conduct and that such associations may exist for entirely *legitimate* purposes. The Court stated the existence of an association-in-fact enterprise is proved by evidence of (1) an ongoing formal or informal organization, (2) evidence that the various associates function as a continuing unit, and (3) evidence showing that the enterprise exists separately from the pattern of racketeering activities. *See id.*

In *Chang v. Chen,* 80 F.3d 1293, 1299 (9th Cir.1996), the Ninth Circuit elaborated on the three enterprise elements, quoting extensively from the Third Circuit's opinion in *United States v. Riccobene,* 709 F.2d 214 (3rd Cir.1983). In *Riccobene,* a criminal prosecution, the court stated "[t]he 'ongoing organization' requirement relates to the superstructure or framework of the group. To satisfy this first element, the government must show that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an ongoing, rather than an *ad hoc,* basis."*Id.* at 222.As to the second requirement, that the associates function as a continuing unit, the *Riccobene* court stated "[t]his does not mean that individuals cannot leave the group or that new members cannot join at a later time. It does require, however, that each person perform a role in the group consistent with the organizational structure ... and which furthers the activities of the organization."*Id.* at 223.[FN2]

[FN2.] In *United States v. Feldman,* 853 F.2d 648, 657 (9th Cir.1988), the Ninth Circuit addressed these two elements as they specifically relate to an association-in-fact enterprise consisting, as here, mostly of corporations. The Ninth Circuit stated that a court must look carefully at the facts alleged to determine if there are sufficient interconnections among the associates to constitute an enterprise. *See id.* at 657-58.Such interconnections may be a parent-subsidiary relationship, similar or related business purposes, shared assets, and overlapping officers and personnel. *See id.*The court noted that where the "associates" in the enterprise are also all

RICO defendants under a charge of conspiracy, the allegations supporting the conspiracy also lend support to both the existence of an ongoing organization and the "continuity" requirement. *See id.*The court also stated that the requirement of continuity of personnel is not absolute and the "determinative factor is whether the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority."*Id.* at 659.

As to the third *Riccobene* requirement, that the enterprise exist separately from the pattern of racketeering activities, the court stated "[a]s we understand this last requirement, it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an ongoing basis is adequate to satisfy the separate existence requirement"*Id.* at 223-24.

The Ninth Circuit has stated that "the involvement of a corporation, which has an existence separate from its participation in the racketeering activity, can satisfy the enterprise element's requirement of a separate structure."*Chang,* 80 F.3d at 1300. Plaintiffs have sufficiently alleged that these single retailer-single manufacturer corporate enterprises had an existence separate from the racketeering activities because "[t]he corporate entities had a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure."*Feldman,* 853 F.2d at 660.

**\*3** Plaintiffs also contend that the existence of association-in-fact enterprises consisting of a single retailer defendant and a single manufacturer defendant is sufficiently established through their allegations of various contracts and agreements between single retailers and single manufacturers and allegations of a course of conduct that gave the individual retailer defendant some means of joint control and participation in the operations of individual garment factories. The alleged agreements and conduct includes purchase agreements, vendor codes of conduct, on-site quality control monitoring by retailers, vendor compliance monitoring, and the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

setting of quality standards and turn-around times. Plaintiffs maintain that the alleged agreements and conduct are sufficient to show a structure for the individual retailer-individual manufacturer enterprises, and an available mechanism for decision-making and direction of the affairs of the enterprise.[FN3] *See Loma Linda Univ. Med. Ctr., Inc. v. Farmers Group, Inc.,* Civ-S-94-0681WBS/JFM, 1995 WL 363441 (E.D.Cal. May 15, 1995) (contractual relationships among various entities can establish the organizational network establishing the RICO enterprise). The court agrees that the allegations are sufficient. The relatedness of the individual retailer's and the individual manufacturer's businesses, the allegations of collusion between individual retailers and individual manufacturers to conceal factory conditions thereby permitting the garments to be promoted as "sweat" free (FAC ¶ 101), and the alleged longevity of the relationships support the existence of the alleged enterprises and are sufficient to allege that the individual retailers and individual manufacturers functioned as continuing units.

> FN3. Both plaintiffs and defendants rely on *River City Markets, Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458, 1461-62 (9th Cir.1992). Plaintiffs argue *River City* supports their position that commercial contractual relationships can serve as the structure for the RICO enterprise; defendants argue *River City* stands for the proposition that where a contract shows nothing in its terms that would violate any federally protected rights if carried out, and there are no allegations that the agreement contemplated or permitted a course of conduct that would involve misconduct, the contracts are not sufficient to allege the existence of a RICO enterprise. The court in *River City* found that the commercial agreements between the associates in the enterprise created a business relationship akin to a joint venture and, in conjunction with the allegations that the individual defendants conducted their RICO activities through the enterprise, held the complaint sufficient to allege the existence of a RICO enterprise and survive a motion to dismiss. *See id.* at 1461.The court then examined the evidence to support those allegations in the context of a motion for summary judgment and found that such routine business

> contracts, without additional evidence showing the agreements were used for an improper purpose or permitted an unlawful course of conduct, were insufficient to establish a RICO enterprise for summary judgment purposes. *See id.* at 1462-63.The alleged contractual relationships in this case, along with plaintiffs' allegations that the defendants conducted their 18 U.S.C. §§ 1581 and 1584 racketeering activities through the enterprises are sufficient to allege the existence of the enterprises at this stage of the litigation.

For the foregoing reasons, the court concludes that plaintiffs have adequately alleged the existence of the various single retailer-single manufacturer RICO enterprises.

**Association-in-fact enterprise consisting of all retailer defendants and all manufacturer defendants has not been sufficiently pleaded.**

Plaintiffs have not adequately alleged the existence of an enterprise consisting of all retailer defendants and all manufacturer defendants. Plaintiffs allege that many retailer defendants contract with the same manufacturer defendants and many retailers use the same vendor compliance monitors and contract brokers. Plaintiffs also allege that many manufacturer defendants are commonly owned and all are members of the Saipan Garment Manufacturers Association, where they exchange information and standardize workplace practices. Although the allegations show common business purposes and interconnections through the utilization of the same contract brokers, compliance monitors, and manufacturers, as well as interconnections between certain of the manufacturers themselves, there are no allegations showing an overarching structure and a mechanism for making decisions and directing or controlling the affairs of all retailer defendants and manufacturer defendants as a group on an ongoing basis. Accordingly, plaintiffs have not sufficiently alleged an enterprise consisting of all retailer defendants and all manufacturer defendants.

**Injury to "property" is adequately pleaded.**

**\*4** Plaintiffs have standing to sue under RICO if and can only recover damages to the extent that they have been injured in their business or property by

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

conduct constituting a violation of § 1962. *See*18 U.S.C. § 1964(c); [FN4]*see also Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 (1985). Plaintiffs must allege a concrete financial loss to their business or property proximately caused by defendants' conduct. *See Oscar v. Univ. Student Co-op. Ass'n,* 965 F.2d 783, 785 (9th Cir.1992). Defendants contend plaintiffs have not alleged injuries to their business or property.

> FN4."Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court ..."18 U.S.C. § 1964(c).

Plaintiffs allege that the following injuries resulted from defendants' conduct, and that the injuries were to their "property" for RICO purposes: (1) lost wages resulting from forced "volunteer" hours, (2) payment of excessive amounts for employer-provided food and housing, and (3) payment of recruitment fees and deposits which contributed to their indentured status.

1. Allegations of lost wages suffice to show an "injury to property" for RICO purposes.

Plaintiffs' allegations of lost wages caused by the predicate acts of involuntary servitude, 18 U.S.C. § 1584, and peonage, 18 U.S .C. § 1581, (FAC ¶¶ 134, 135), show a concrete financial loss suffered by plaintiffs; i.e. they show an injury to plaintiffs' property for RICO purposes.[FN5]Defendants rely upon and analogize to *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.,* 941 F .2d 1220 (D.C.Cir.1991), wherein the plaintiffs/employees were mis-classified and as a result received a lower wage rate. *Danielsen* is distinguishable from the allegations in this case because plaintiffs there were being paid the wage specified in their contract, were not working unpaid hours, and, in that court's opinion, were attempting to turn a wage dispute into a RICO action by tenuous allegations of mail and wire fraud. *See id.* at 1228-29.Here, plaintiffs allege they are being forced to work for *no* pay as a result of defendants' alleged scheme to place and keep them in indentured status.

> FN5.*See e.g. Libertad v. Welch,* 53 F.3d 428, 437 n. 4 (1st Cir.1995) (lost wages could be an injury to property under RICO); *Reynolds v. Condon,* 908 F.Supp. 1494,

1519 (N.D.Iowa 1995) (loss of income may suffice to state a RICO injury); *Rodonich v. House Wreckers Union Local 95 of Laborers' Int'l Union,* 627 F.Supp. 176, 180 (S.D.N.Y.1985) ("to the extent plaintiffs' purported injuries consist of lost wages, sufficient proprietary damage is alleged").

2. Allegations of excessive payments for employer-provided food and lodging suffice to show an "injury to property" for RICO purposes.

Plaintiffs' allegations of excessive payments for employer-provided food and housing are sufficient to show an injury to property caused by the defendants' alleged violations of RICO. *See Blue Cross & Blue Shield of New Jersey v. Philip Morris, Inc.,* 36 F.Supp.2d 560, 569 (E.D.N.Y.1999) (expenditure of money as a result of defendants' RICO activities, that would not have been spent or would have been spent on other things, is an injury under RICO). The alleged payments for food and housing are concrete financial losses and plaintiffs allege they are required to make these payments, which are in excess of the defendants' actual costs, as part of the scheme to keep plaintiffs in an indentured status. (FAC ¶¶ 8-9, 125). Plaintiffs do not have to explicitly allege that the payments exceeded market value; that is reasonably inferred from the allegations. (FAC ¶¶ 8,15, 16, 17, 19, 20, 22, 24).

3. Allegations of actual payment of recruitment fees suffice to show an "injury to property" for RICO purposes; allegations that "deposits" may not be returned are not sufficient to show an "injury to property" sufficient for RICO purposes.

**\*5** Plaintiffs also adequately allege payment of the recruitment fees as an injury caused by defendants' RICO violations. All plaintiffs allege they paid recruitment fees. (FAC ¶¶ 15-39). Plaintiffs further allege that the imposition of fees by the recruiters (who actually are acting as defendants' agents) are part of the scheme to place and keep them in an indentured servant status.[FN6] These allegations show a concrete financial loss. (FAC ¶¶ 121-122). Defendants cite *Dumas v. Major League Baseball Props., Inc.,* 104 F.Supp.2d 1220, 1223 (S.D.Cal.2000), for the proposition that there is no injury where plaintiffs voluntarily pay money and receive the benefit of their bargain. The court in *Dumas* stated, however, that had plaintiffs alleged that defendants' conduct was fraudulent or dishonest

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

and that they did not receive the benefit of their bargain as a result of that dishonesty, an injury under RICO may have been sufficiently pled. See id.Plaintiffs here have alleged they did not get the benefit of their bargain based on the defendants' alleged dishonest conduct; i.e. that the "recruiters" are actually in the service of the defendants. (FAC ¶ 5-6).

> FN6. Defendants presented the affidavit of Yafeng Sun attesting that recruiting fees are governed by and imposed as a matter of Chinese law. Defendants contend that the Court may consider the affidavit because it was submitted on an issue of foreign law pursuant to FRCP 44.1. Defendants note there is no allegation that the recruitment fees are in excess of that authorized by the Chinese Ministry of Foreign Trade and Economic Cooperation and cite to the MOFTEC regulations attached as an exhibit. Plaintiffs object to the affidavit as an evidentiary submission and argue that even if recruitment fees were permitted under Chinese law, they have alleged they are excessive and unlawful under American law. The FAC appears to raise an issue of foreign law, but not with respect to recruitment fees. In support of the peonage and indentured servitude claims plaintiffs allege "Class members have been threatened by the Chinese government with deportation, arrest and prosecution in China if they speak unfavorably about their employers."(FAC ¶ 119(e)). With respect to recruitment fees, plaintiffs only allege they are recruited by "private agencies" acting as agents of defendants. (FAC ¶ 121). Plaintiffs have alleged an injury based on their payment of recruitment fees sufficient to survive a motion to dismiss; however, the Rule 44.1 submissions regarding the nature of the recruitment fees may again be submitted in conjunction with any subsequent dispositive motion.

However, the deposits plaintiffs allegedly made to the recruiters to ensure completion of their contracts with defendants do not constitute a concrete financial loss because plaintiffs acknowledge that the deposits will be returned to them upon completion of their contracts and only speculate that the deposits may be lost. (FAC ¶ 119(a)). There are no allegations

in the FAC that plaintiffs have lost their deposits. See Lui Ciro, Inc. v. Ciro, Inc., 895 F.Supp. 1365, 1378 (D.Haw.1995) (no RICO injury where alleged damages are contingent and not concrete).

### Plaintiffs lack standing to seek injunctive relief under RICO.

Defendants argue that plaintiffs have no standing under RICO to seek injunctive relief and that ¶¶ 176 and 181 of the FAC must therefore be stricken. Plaintiffs have offered no counter argument. In Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076, 1088 (9th Cir.1986), the Ninth Circuit held that injunctive relief is not available to civil RICO plaintiffs. Accordingly, ¶¶ 176 and 181 of the FAC are stricken.

For the foregoing reasons, the court concludes that plaintiffs have adequately alleged injury to their property based on lost wages for unpaid work hours, excessive payments for employer-provided food and housing, and payment of recruiting fees. However, the allegations of non-return of "deposits" are too speculative. Plaintiffs may not seek injunctive relief under RICO.

### Plaintiffs have not alleged an "investment injury" under § 1962(a)

In order to state an "investment injury" claim based on a violation of 18 U.S.C. § 1962(a), plaintiffs must allege that the injury to their property resulted from defendants' use or investment of RICO proceeds. See Nugget Hydroelectric L.P. v. Pacific Gas & Elec., 981 F.2d 429, 437 (9th Cir.1992) (standing to sue under § 1962(a) requires alleged injury in business or property by the use or investment of the racketeering income).FN7 Defendants contend that plaintiffs have failed to allege a use or investment injury.

> FN7. An injury under 18 U.S.C. § 1962(a) resulting from use or investment of proceeds is different from an injury under 18 U.S.C. § 1962(c) resulting from the predicate acts. See Nugget Hydroelectric L.P. v. Pacific Gas & Elec., 981 F.2d 429, 437 (9th Cir.1992).

*6 In count two of the FAC plaintiffs allege that "defendants conspired to derive, and did derive,

substantial proceeds through the above-described pattern of racketeering activity and conspired to use or invest, and used or invested, such proceeds in the operation of the association-in-fact enterprises."(FAC ¶ 179). In ¶ 180 plaintiffs allege "[a]s a direct and proximate result of defendants' violations of § 1962(a) and (d) of RICO, plaintiffs and the members of the Class have been injured in their business or property."

The FAC contains no allegations, other than the aforementioned conclusory paragraphs, that allege or reasonably give rise to an inference that defendants used or invested alleged racketeering proceeds in the establishment or operation of any enterprise. Even taking these use/investment allegations as true, plaintiffs' factual allegations of injury are not sufficient to show an injury resulting from such use or investment, as opposed to injuries caused by the predicate acts. See U.S. Concord, Inc. v. Harris Graphics Corp., 757 F.Supp. 1053, 1060 (N.D.Cal.1991) (reinvestment in the RICO enterprise itself is insufficient where plaintiff sustained no injury other than from the predicate acts themselves). Because plaintiffs have not properly alleged an investment injury, they lack standing to assert a claim for violation of § 1962(a).

Plaintiffs' claim of a § 1962(d) conspiracy to violate § 1962(a) also fails because plaintiffs have not alleged the requisite injury resulting from the conspiracy. See Beck v. Prupis, 120 S.Ct. 1608, 1616 n. 9 (2000) ("a plaintiff suing for a violation of § 1962(d) based on an agreement to violate § 1962(a) is required to allege injury from the 'use or invest [ment]' of illicit proceeds."). Accordingly, plaintiffs have failed to sufficiently plead any claim based on RICO § 1962(a) and count two is therefore dismissed as to all defendants.

CNMI statutory offenses can be RICO predicate acts and violation of criminal peonage statute and Hobbs Act are adequately alleged as "predicate acts" supporting a "pattern of racketeering activity" under RICO.

Plaintiffs must allege a "pattern of racketeering activity" in order to state a claim based on violation of RICO § 1962(a) or § 1962(c). A "'pattern of racketeering activity' requires at least two acts of racketeering."See18 U.S.C. § 1961(5). Acts of racketeering include "any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery,

extortion ... which is chargeable under State law and punishable by imprisonment for more than one year" and specific enumerated offenses indictable under Title 18 of the United States Code, including peonage and involuntary servitude. See18 U.S.C. § 1961(1), § 1581, § 1584. Defendants contend that plaintiffs have not adequately pleaded the predicate acts of racketeering.

1. CNMI statutory offenses

Certain acts "chargeable under State law" may be RICO predicate acts. See18 U.S.C. § 1961(1)(A). Defendants, relying mostly on principles of statutory construction, argue that the acts specified in § 1961(1)(A), as codified under CNMI statutory law, do not constitute RICO predicate acts because the CNMI is not explicitly included in the definition of a "state" under RICO.[FN8]Defendants concede, however, that they have found no rationale as to why Congress would choose to exempt CNMI statutory offenses as RICO predicate acts while including as predicate acts the similar statutory offenses of all other United States territories and possessions. RICO is applicable to the Commonwealth pursuant to § 502(a)(2) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"), Act of Mar. 24, 1976, Pub.L. No.94-241, 90 Stat. 263 (1976), reprinted at48 U.S.C. § 1681. The definition of "state" under RICO includes "any territory or possession of the United States."See18 U.S.C. § 1961(2). The Ninth Circuit has held that the CNMI is encompassed by the term "territory" under various statutes. See Saipan Stevedore Co. v. Dir. Workers' Comp. Programs, 133 F.3d 717, 720 (9th Cir.1998) (CNMI is plainly a United States "territory" under the Longshore and Harbor Workers' Compensation Act); Micronesian Telecomms. Corp. v. NLRB, 820 F.2d 1097, 1100 (9th Cir.1987) (CNMI falls within the meaning of "territory" under the National Labor Relations Act).[FN9] To interpret RICO as not encompassing CNMI statutory offenses would seem contrary to both the provisions of the Covenant and the broad scope of RICO. See Sedima, 473 U.S. at 498, 105 S.Ct. at 3286 (RICO is to be construed liberally to effectuate the statute's remedial purposes). Accordingly, the Court finds that CNMI statutory offenses may constitute predicate acts under RICO.

FN8."State means any State of the United States, District of Columbia, the Commonwealth of Puerto Rico, any territory

Case 1:07-cv-00021    Document 25-5    Filed 01/31/2008    Page 14 of 39

Not Reported in F.Supp.2d                                                        Page 7
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

or possession of the United States, any political subdivision, or any department, agency or instrumentality thereof."18 U.S.C. § 1961(2).

FN9. Defendants also cite *United States v. Bordallo, 857 F.2d 519, 523-524 (9th Cir.1988)*, in support of their argument that the CNMI is not encompassed by the term "state" under RICO. In *Bordallo,* the court overturned a bribery conviction on the ground that Guam was not a state for purposes of the federal bribery statute because the term "state" was left undefined and the court had previously held that Guam is not included in the meaning of the term state absent express congressional intent. Under RICO, Congress has defined "state" and Congress' intent to include the CNMI is apparent from the use of the phrase "any territory or possession" in the definition.

2. Involuntary servitude and criminal peonage.

*7 To establish the crime of involuntary servitude under 18 U.S.C. § 1584, a prosecutor must allege and prove beyond a reasonable doubt the use or threatened use of physical restraint, physical coercion or legal coercion to compel labor. *See United States v. Kozminski, 487 U.S. 931, 952, 108 S.Ct. 2751, 2765 (1988).*

To establish the crime of peonage under 18 U.S.C. § 1581, a prosecutor must allege and prove beyond a reasonable doubt that the victim was "working for a debt which he owed the [master], and [ ] the labor was performed under such coercion as to become compulsory service for the discharge of the debt."*See United States v. Reynolds, 235 U.S. 133, 35 S.Ct. 86 (1914).*

An actual conviction for the crime is not a condition precedent to the filing of a civil lawsuit; plaintiffs need only allege two predicate acts that violated one or more of the federal criminal laws enumerated in 18 U.S.C. § 1962(1).*See, e.g., Schreiber Distributing v. Serv-Well Furniture Co, 806 F.2d 1393, 1396-1401 (9th Cir.1986).*

As discussed *infra,* plaintiffs have not sufficiently pleaded a claim for involuntary servitude but have adequately alleged that they were held in a

condition of peonage based on their recruitment fees and other debts through threats or use of physical or legal coercion.

3. The Hobbs Act

The Hobbs Act makes it a crime to interfere with commerce by use of extortion. *See*18 U.S.C. § 1951(a)." '[E]xtortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under the color of official right."18 U.S.C. § 1951(b)(2). To prove extortion by wrongful use of force or fear, it must be established that "(1) the defendant induced someone to part with money, property, or other valuable right by the wrongful use or threat of force or fear; (2) the defendant acted with the intent to obtain money or property that defendant knew he was not entitled to receive; and (3) commerce from one state to another was or would have been affected in some way."*United States v. Dischner,* 947 F.2d 1502, 1516 (9th Cir.1992).

Plaintiffs contend they have been deprived of property in the form of unduly high payments of money to defendants for substandard food and housing, recruitment fees, and medical expenses, and that they have been penalized by defendants through being forced to work unpaid "volunteer" hours.

Money is clearly "property" within the meaning of the Hobbs Act, and it can reasonably be inferred from the allegations in the complaint that the manufacturer defendants, or their agents, wrongfully coerced payment of fees for inadequate food and housing and recruiting fees, and that these fees and payments were in some respect unlawful.

It cannot, however, be reasonably inferred from the allegations that payments for medical expenses were coerced. Plaintiffs allege that the defendants provide in-house medical clinics and if they choose to seek outside medical attention they must then pay for it. There is no allegation that the defendants forced the plaintiffs to use the in-house medical services and in that manner obtained money or property belonging to the plaintiffs. (FAC ¶ 127).

*8 As to the "volunteer" hours, plaintiffs have sufficiently alleged that the unpaid work was performed under threatened force, violence, or fear. It may be reasonably inferred from the allegations that

plaintiffs were essentially induced to part with their valuable right to compensation for their labor by the wrongful use or threat of force or fear, and that the manufacturer defendants acted with intent to deprive plaintiffs of money and to profit therefrom.[FN10]

> FN10. Defendants cite *Toms v. Pizzo, 4 F.Supp.2d 178, 183 (W.D.N . Y.1998),* for the proposition that "volunteer" labor is not a violation of the Hobbs Act. In *Toms,* the plaintiff, an independent contractor, alleged that he was forced to perform more services than his contract called for and that the defendants were using threats of economic interference to put him out of business while acquiring his trade secrets.*Toms* is distinguishable from this case because, under the facts alleged in *Toms,* the court found Toms's claim essentially concerned the scope of his contractual obligations, and not the "volunteer" hours complained of here.

There is no aiding and abetting liability under RICO and thus the court need not decide whether the retailer defendants may nevertheless be liable where they aided and abetted predicate acts.

The retailer defendants contend there is no aiding and abetting liability under RICO and therefore they may not be held liable for either aiding and abetting a substantive RICO violation or for aiding and abetting the predicate acts.

In *Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S.Ct. 1439 (1994),* the Supreme Court held that there is no private cause of action for aiding and abetting a securities violation under § 10(b) of the Securities and Exchange Act. Since the Supreme Court's *Central Bank* decision, nearly every court that has considered the aiding and abetting issue as applied to RICO has determined that there is no aiding and abetting liability under RICO. Based on *Central Bank,* the court concludes plaintiffs cannot state a claim against the retailer defendants based on a theory of aiding and abetting violations of RICO or allegations that defendants aided and abetted the commission of predicate acts.

Plaintiffs have not sufficiently alleged the retailer defendants' participation in, or conduct of, the affairs of an enterprise.

In order to state a claim based on violation of RICO § 1962(c), plaintiffs must allege that the defendants "(1) conduct (2) [the affairs] of an enterprise (3) through a pattern of (4) of racketeering activity."*Sedima, 473 U.S. at 496, 105 S.Ct. at 3285.* "[T]he essence of the violation is the commission of those [racketeering] acts in connection with the conduct of an enterprise."*Id. at 497, 105 S.Ct. at 3285.* In *Reves v. Ernst & Young, 507 U.S. 170, 184, 113 S.Ct. 1163, 1170 (1993),* the Supreme Court determined that participation in the conduct of the affairs of the enterprise requires that the defendant have some part in the direction of the enterprise. The Court stated it encompasses both upper level management as well as lower rung participants who are under the direction of upper management, and that liability is also extended to those "associated with" the enterprise who participate in the operation and management of the enterprise's affairs.[FN11]*See id . at 185, 113 S.Ct. at 1173.* The retailer defendants contend plaintiffs have failed to adequately allege their participation in the various enterprises.

> FN11. Plaintiffs argue the *Reves* test is not applicable here because that test only applies when the person is outside the enterprise and not when the person is alleged to be part of the enterprise. *Reves* interpreted what it means to conduct or participate in the conduct of the affairs of an enterprise. *See id . at 177, 113 S.Ct. at 1169.* The Court's ruling was not explicitly or implicitly limited to persons outside the enterprise. In fact, the Court noted the test had equal applicability to employees (insiders) of the enterprise as it did to those "associated with" (outsiders) the enterprise. *See id. at 184-85, 113 S.Ct. at 1172-73.* Accordingly, the Court finds the "operation and management" test in *Reves* is applicable to determine if plaintiffs have sufficiently alleged the retailer defendants' participation in the enterprise.

As noted above, the allegations adequately show an *opportunity* for the retailer defendants to participate in the enterprise. However, for the reasons given below, the allegations purportedly showing that the retailer defendants actually did participate in the enterprise are insufficient to constitute the requisite "participation." *See Comwest, Inc. v. American*

*Operator Services, Inc.,* 65 F.Supp. 1467, 1475 (C.D.Cal.1991) (allegations of assisting with certain aspects of the enterprise were not sufficient to suggest that the defendant had any actual control over the enterprise's course of action).

**\*9** In ¶ 11 of the FAC plaintiffs allege the retailer defendants knowingly or recklessly participated in the enterprise and in ¶ 133 plaintiffs set forth the factual allegations which they contend support the retailers' participation in the enterprise. Plaintiffs allege in section (a) of ¶ 133 that the retailer defendants have control over minimum wage, overtime policies, and working conditions through monitoring and oversight of conditions but that they "apparently acquiesce to such conditions." Generally, the cases seem to suggest that mere acquiescence to conditions does not constitute "participation" in the conduct of the enterprise. *See Cruse v. Equitable Securities of New York, Inc.,* 678 F.Supp. 1023, 1034 (S.D.N.Y.1987) ("non-action or nonfeasance [ ] is not the active participation in racketeering activity required before plaintiff may invoke the RICO statute"). Although *Cruse* was a securities case involving the duties of a stock broker, it provides guidance here.

Sections (d), (f) and (g) of ¶ 133 allege that the retailer defendants impose substantial economic pressure on the manufacturer defendants to violate wage and overtime provisions. Alleged economic pressure generated under the terms of the contracts between retailers and manufacturers, however, is not equivalent to participation in the enterprise. *See, e.g., Morin v. Trupin,* 832 F.Supp. 93 (S.D.N.Y.1993) (substantial persuasive power to induce management to take certain actions is not equivalent to having the power to conduct or participate in the conduct of the enterprise's affairs). *Morin* involved a law firm that advised a corporation; again, the court adopts its reasoning in the instant matter.

Section (e) of ¶ 133 alleges that the retailer defendants failed to exert their economic leverage over the manufacturer defendants to control working conditions. A failure to act is not participation in the conduct of an enterprise. *See Reves,* 507 U.S. at 185, 113 S.Ct. at 1173 (accounting firm's failure to act did not constitute participation in the conduct of the enterprise); *see also Kerr-McGee Corp. v. Ma-Ju Marine Services, Inc.,* 830 F.2d 1332, 1342 (5th Cir.1987) (failure to exert economic pressure did not give rise to liability under section 5(b) of the

Longshoremen's and Harbor Workers' Compensation Act).

Paragraph 133, sections (b) and (c) allege that the retailer defendants have control over the operational details and thus effectively supervise the production process through oversight and quality control monitoring. This is the only affirmative conduct by the retailers which plaintiffs have alleged; however, the allegation of quality control monitoring is insufficient to give rise to an inference that the retailer defendants were directing the enterprise at some level through a pattern of racketeering activities. *See Comwest,* 765 F.Supp. at 1475 (allegations that defendant effectively controlled operations through assisting certain activities were not sufficient to suggest defendant had any actual control or decision making authority over the affairs of the enterprise).

**\*10** Accordingly, and for the foregoing reasons, the court concludes that plaintiffs have not sufficiently alleged the that retailer defendants participated in the conduct of the affairs of the enterprises.[FN12]

FN12. Plaintiffs also allege the retailers and the manufacturers are joint venturers and each others agents and in this manner are apparently attempting to impose liability vicariously upon the retailer defendants. *See Brady v. Dairy Fresh Products Co.,* 974 F.2d 1149, 1154 (9th Cir.1992) (holding that "an employer that is benefitted by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise."). As discussed *infra* in the vicarious liability analysis, plaintiffs have failed to adequately plead these relationships. Further, it appears that the retailer defendants may not be held vicariously liable under § 1962(c) for the manufacturer defendants' conduct on an agency theory because, as the purported "employer" of the manufacturer defendants, they not sufficiently distinct from the association-in-fact enterprise. *See Brady,* 974 F.2d at 1154-55. To permit a "person" that is associated with an associate-in-fact enterprise to be held liable on an agency basis instead of finding liability based on the

Case 1:07-cv-00021    Document 25-5    Filed 01/31/2008    Page 17 of 39

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.2d)**

person's participation would seem to be inconsistent with § 1962(c) requirement that the "person" must participate in the enterprise in order to be held liable.

Plaintiffs have sufficiently pleaded a conspiracy under § 1962(d) to violate § 1962(c) but have not sufficiently pleaded a conspiracy under § 1962(d) to violate § 1962(a).

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section." 18 U.S.C. § 1962(d). Defendants contend that because plaintiffs have not sufficiently alleged RICO claims based on violations of § 1962(a) ( "use or investment") and (c) ("enterprise"), they cannot allege a conspiracy to violate those sections under § 1962(d). *See Simon v. Value Behavioral Health, Inc.,* 208 F.3d 1073, 1084 (9th Cir.2000) ("[F]ailure to plead the requisite elements of either a Section 1962(a) or a Section 1962(c) violation implicitly means that he cannot plead a conspiracy to violate either section.").

To state a claim for conspiracy under RICO, it must be alleged that the defendants knew about and agreed to facilitate some criminal scheme, and the scheme, if completed, must constitute a criminal offense under RICO. *See Salinas v. United States,* 522 U .S. 52, 63-64, 118 S.Ct. 469, 477-78 (1997); *see also Howard v. America Online,* 208 F.3d 741, 751 (9th Cir.2000) (a defendant must be aware of the essential nature and scope of the enterprise and agree to participate in it). This requirement is satisfied where an agreement which is a substantive violation of RICO is alleged or it is alleged that the defendants agreed to commit or participate in two predicate offenses. *See Howard,* 208 F.3d at 751. A defendant need not agree to commit or facilitate every part of the substantive offense under RICO. *See Salinas,* 522 U.S. at 65, 118 S.Ct. 478. Further, a defendant need not have violated the substantive RICO provision in order to be liable as a conspirator. *See Beck.,* 120 S.Ct. at 1614-17.

In count one of the FAC plaintiffs allege that defendants agreed and conspired among themselves to conduct or participate in the conduct of the affairs of various enterprises through a pattern of racketeering activity. (FAC ¶ 174). In ¶ 101 of the factual allegations, plaintiffs allege that the defendants entered into an agreement to either commit or keep secret the wrongful and tortious acts described in the complaint. Further, it can be inferred from the allegations in ¶¶ 11 and 133-139 that the retailer defendants knew or were aware of the conditions at the factories and, *arguendo,* knew of the essential nature and scope of the criminal scheme. Thus, plaintiffs have sufficiently pleaded the retailer defendants' knowledge or awareness of the scheme and an agreement to facilitate it.

Plaintiffs must also allege the requisite injury to property under § 1962(a) and (c) in order to state a conspiracy claim under § 1962(d). *See Beck.* 120 S.Ct. at 1616 and n. 9. As noted *supra,* plaintiffs have not alleged the requisite injury under § 1962(a) and thus the conspiracy claim based thereon fails; plaintiffs have sufficiently alleged a violation of § 1962(c) and their conspiracy claim based thereon survives this motion to dismiss.

VICARIOUS / JOINT LIABILITY FOR COUNT 3 (ANTI-PEONAGE ACT), COUNT 4 (PEONAGE AND INVOLUNTARY SERVITUDE IN VIOLATION OF THE 13TH AMENDMENT), AND COUNT 5 (INTERNATIONAL LAW VIOLATIONS)

**\*11** Plaintiffs allege that the retailer defendants and manufacturer defendants are joint venturers, joint conspirators, agents, and/or aiders and abettors of one another. Plaintiffs contend that because of these relationships the retailer defendants are vicariously or jointly liable for the alleged labor violations of the manufacturer defendants. Defendants contend such relationships are not adequately alleged.

Joint venture is not sufficiently pleaded.

To allege the existence of a joint venture plaintiffs must allege an undertaking by two or more persons jointly to carry out a single enterprise for profit. *See Shell Oil Co., v. Prestige,* 249 F.2d 413, 415 (9th Cir.1957). The elements of a joint venture are (1) joint interest in a common business; (2) an understanding to share profits and losses; and (3) a right to joint control. *Jackson v. East Bay Hospital,* 246 F.3d 1248, 1261 (9th Cir.2001).*See also 580 Folsom Associates v. Prometheus Development Company,* 223 Cal.App.3d 1, 15-16, 272 Cal.Rptr. 227, 234 (1990). The existence of a joint venture may be implied from the acts and declarations of the parties. *580 Folsom Associates,* 223 Cal.App. at 15-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 11
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.2d)**

16, 272 Cal.Rptr. at 234.

Although plaintiffs have adequately alleged the existence of certain RICO enterprises, the alleged manufacturer enterprises and retailer enterprises do not constitute the "common business" contemplated by a joint venture arrangement. Moreover, the plaintiffs' allegations of the competitive bidding process that the retailers employ negate their contention that the retailers and manufacturers have joint interest in a common business. (FAC ¶ 133(g)).*See, e.g., Universal Sales Corp. v. California Press Mfg.,* 20 Cal.2d 751, 764-65, 128 P.2d 665, 673 (1942) (joint venture relationship implied from contracts providing for cooperation in promotion of product, payment of sales royalties, sharing of interest in patent, and cooperative effort of both parties in the repair and improvement of the product).

The agreements plaintiffs allege which give structure to the RICO enterprises do not give rise to a common business, do not provide for joint control over any business, and do not demonstrate any understanding to share profits and losses. Plaintiffs' allegations that the defendants' businesses were profitable and that defendants profited from the alleged scheme are insufficient to infer an understanding to share profits and losses.

Nor can a joint venture be inferred from the conduct of the retailer defendants and manufacturer defendants. Although plaintiffs have alleged the opportunity for the retailer defendants to exert some control over the operations of the manufacturers, the retailers' conduct, as alleged by plaintiffs, shows at most an oversight function wherein the retailers monitor quality control. (FAC ¶ 133).

Accordingly, plaintiffs have not adequately alleged a joint venture relationship between retailer and manufacturer defendants.

Agency relationship is not sufficiently pleaded.

**\*12** An organization may be held liable for the acts of its agents that are undertaken within the scope of their actual or apparent agency. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 930, 102 S.Ct. 3409, 3434 (1982). There must, however, be "sufficient allegations to support the legal conclusion respecting agency" in order to survive a motion to dismiss. *Pinski v. Adelman,* No. 94 C 5783, 1995 WL

669101, \*14 (N.D.Ill. Nov. 7, 1995).

An agency relationship exists when one "undertakes to transact some business [or] manage some affair ... by authority of and on account of [the principal]." *In re Coupon Clearing Service,* 113 F.3d 1091, 1099 (9th Cir.1997). The Restatement of Agency defines an agency relationship as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."*Restatement (Second) of Agency § 1(1) (1958).*"[A]pparent agency arises as a result of conduct of the principal which causes the third party reasonably to believe that the agent possesses the authority."*Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 480 (9th Cir.1991). An "important aspect in determining the existence of an agency relationship is the degree of control exercised by the principal over the activities of the agent."*In re Coupon Clearing Service,* 113 F.3d at 1099.<sup>FN13</sup>

> FN13.*See also Cislaw v. Southland Corp.,* 4 Cal.App.4th 1284, 1291, 6 Cal.Rptr.2d 386, 391 (1992) ("[T]he right to control the means and manner in which the result is achieved ... is significant in determining whether a principal-agency relationship exists."); *Restatement (Second) of Agency § 14 (1958)* ("A principal has the right to control the conduct of the agent with respect to matters entrusted to him.").

The complaint alleges a contractual relationship between the retailers and the manufacturers for the manufacture of garments. Even though plaintiffs have alleged the contracts provided the retailer defendants with the right to establish quality standards and turn-around times, and the right to monitor production, it cannot be inferred from the contracts alleged or the conduct of the retailers that is alleged that the retailers possessed the right to control the means and manner in which the manufacturers conducted their businesses or performed the obligations under the contracts.<sup>FN14</sup>

> FN14. Even where a contract provides for some supervisory rights as plaintiffs have alleged, liability will not be imposed absent affirmative interjection, which plaintiffs have not sufficiently alleged. *See McDonald v. Shell Oil Co.,* 44 Cal.2d 785, 788-791,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00021     Document 25-5     Filed 01/31/2008     Page 19 of 39

Not Reported in F.Supp.2d                                                                                       Page 12
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

285 P.2d 902, 904-905 (1955) (contract between parties providing that one party will have a general supervisory right over an independent contractor so as to insure satisfactory completion of the contract does not make the hirer liable for the independent contractor's negligent acts in performing the details of the work, absent some showing that the hirer exercised active control over, interfered with, actively directed the independent contractor's operation, or otherwise had some duty; the right to control and the presence of the hirer at the site does not change that relationship.); *Safeway Stores, Inc. v. Massachusetts Bonding & Ins. Co., 202 Cal.App.2d 99, 110-110, 20 Cal.Rptr. 820, 825-826 (1962)* (the right to act did not raise the duty to act and even where there is a duty of care owed, mere passive negligence or failure to act may not be sufficient to impose vicarious liability); *Kuntz v. Del E. Webb Constr. Co., 57 Cal.2d 100, 105-107, 368 P.2d 127, 130-131 (1961)* (mere right to see that work is satisfactorily completed imposes no duty upon the one hiring an independent contractor to ensure that the contractor's work is performed in conformity with all safety provisions).

Assuming *arguendo* that this contractual relationship establishes a principal-agent relationship, the allegations do not show that the manufacturers alleged unlawful conduct was undertaken pursuant to actual or apparent authority conferred by the retailer defendants. A principal may be liable for his agent's actions taken within the scope of their general apparent authority and done on behalf of the principal as opposed for their own personal benefit. See *Jund v. Town of Hempstead, 941 F.2d 1271, 1280 (2nd Cir.1991)*. Because the retailers and the manufacturers both benefit from the production of garments at the lowest possible cost, plaintiffs' allegations that the retailers profited from the manufacturers' conduct, without more, are insufficient to infer the manufacturers were acting as the retailers agents and on the retailers' behalf in performing the alleged unlawful acts. Further, plaintiffs' allegations that the retailers exerted economic pressure on the manufacturer defendants without allegations that the retailers had the right to control the means of production, are insufficient to show the retailers were acting as principals in an agency relationship. See, e.g., *Brown v. N.L.R.B., 462

F.2d 699, 703 (9th Cir.1972)* (evidence of economic control does not necessarily show an "employee" status as opposed to an independent contractor status; where there is a mutual economic goal, it is the right to control the means used to pursue that goal that is highly material to determination of employee or independent contractor status).

### Aiding and abetting of civil claim is not sufficiently pleaded.

**\*13** Civil aiding and abetting includes the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch, 705 F.2d 472, 477 (D.C.Cir.1983)*. In addition, "[a]dvice or encouragement to act operates as moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." *Id.* at 478 (citing *Restatement (Second) of Torts § 876 (1979))*.[FN15]

FN15. § 876. Persons Acting in Concert. For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement (Second) of Torts § 876 (1979)*.

The business and contractual arrangements alleged, and the actions taken pursuant thereto, do not show or imply that the retailers provided substantial assistance to the manufacturers. Even if the quality control monitoring alleged could be considered substantial assistance, it is not assistance in the alleged peonage, involuntary servitude, or labor violations.

Plaintiffs have also alleged the retailer defendants "encouraged" the manufacturers' conduct; however the conclusory allegations of encouragement are not supported by factual allegations demonstrating active encouragement. To the contrary, plaintiffs' allegations show that the retailers failed to act and remained silent. *See id.* at 481 (mere presence at the scene is not sufficient for liability). Although silence has been found to constitute substantial assistance under some circumstances, *see id* . at 485 n. 14, the Supreme Court's decision in *Central Bank* cautions against imposition of aiding and abetting liability for violation of a statute where Congress has not expressly provided for such liability. *See id., 511 U.S. at 182, 114 S.Ct. at 1450-51* ("Congress has not enacted a general civil aiding and abetting statute-either for suits by the Government (when the Government sues for civil penalties or injunctive relief) or for suits by private parties."). Accordingly, plaintiffs have not adequately pleaded that the retailers aided and abetted in the manufacturer's conduct.

Civil conspiracy is adequately pleaded.

To plead a civil conspiracy, plaintiffs must allege (1) an agreement between two or more persons, (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) an overt act pursuant to and in furtherance of the common scheme, and (4) an injury caused by an unlawful overt act performed by one of the parties to the agreement. *Halberstam,* 705 F.2d at 477. "It is only where means are employed, or purposes are accomplished, which are themselves tortious, that conspirators who have not acted but have promoted the act will be held liable." *Id.* "Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Id.*

Plaintiffs have adequately alleged an agreement to participate in an unlawful scheme, overt acts in furtherance thereof, and injury caused by tortious overt acts as discussed above in the RICO analysis. Accordingly, plaintiffs have sufficiently pleaded that the retailers and the manufacturers were co-conspirators.

COUNT 3 (VIOLATION OF THE ANTI-PEONAGE ACT); COUNT 4 (PEONAGE AND INVOLUNTARY SERVITUDE IN VIOLATION OF THE 13TH AMENDMENT)

Plaintiffs do not state a claim under the Anti-Peonage Act because state action is required.

*14 Defendants contend plaintiffs must allege state action in order to state a claim under the Anti-Peonage Act and that because plaintiffs cannot allege state action, the claim must be dismissed. This court agrees.

In 1867 Congress passed the Anti-Peonage Act, codified at 42 U.S.C. § 1994, which prohibits the holding of individuals to forced servitude.[FN16] *See Craine v. Alexander,* 756 F.2d 1070, 1074 (5th Cir.1985). The Anti-Peonage Act was enacted to enforce the Thirteenth Amendment. The Act basically performed three separate tasks: it abolished peonage,[FN17] it declared null and void all existing and future state laws and practices which enabled peonage to exist,[FN18] and it provided criminal penalties for individuals holding another in a state of peonage.[FN19] *See Pollack v. Williams,* 322 U.S. 4, 8 n. 8, 64 S.Ct. 792, 795 n. 8 (1944).

FN16. The Anti-Peonage Act states:
"The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service of labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void." 42 U.S.C. § 1994.
The criminal sanctions provision of the Anti-Peonage Act have been codified at 18 U.S.C. § 1581. The statute states:
"(a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

FN17. *See supra* Clause One of the Anti-Peonage Act.

FN18. *See supra* Clause Two of the Anti-Peonage Act.

FN19.*See supra* The criminal sanctions provision of the Anti-Peonage Act, codified at 18 U.S.C. § 1581.

Plaintiffs cite to *Clyatt v. United States,* 197 U.S. 207, 25 S.Ct. 429 (1905), as standing for the proposition that state action is not required to state a claim under the Anti-Peonage Act. In *Clyatt,* the Supreme Court granted certiorari to review a judgment convicting the defendant of holding persons in peonage.[FN20] In its analysis, the Court first considered the constitutionality of the statutes[FN21] which made it a crime to hold or return a person to a state of peonage. *Clyatt,* 197 U.S. at 215, 25 S.Ct. at 430. In discussing the constitutionality of the statutes, the Court noted that "Congress may enforce the Thirteenth Amendment by direct legislation" and "[i]n the exercise of that power Congress has enacted these [statutes] denouncing peonage, and punishing one who holds another in that condition of involuntary servitude." *Id.* at 218, 25 S.Ct. at 431. The Court went further and stated that "[w]e entertain no doubt of the validity of this legislation, or its applicability to the case of any person holding another in a state of peonage, and this is whether there be a municipal ordinance or state law sanctioning such holding." *Id.,* 25 S.Ct. at 431. Plaintiffs rely on this statement as controlling precedent that an individual could be subject to a civil suit for peonage under the Anti-Peonage Act whether or not there was some state law or practice enabling the peonage. This court disagrees with the Plaintiffs' interpretation because *Clyatt* involved a criminal prosecution. The Court finds no basis in *Clyatt* for assuming that an individual has a civil cause of action under the Anti-Peonage Act against another individual, absent state action.

FN20. The defendant in *Clyatt* was a private actor who was criminally charged by the United States with holding the two plaintiffs in a condition of peonage. *Clyatt,* 197 U.S. at 209, 25 S.Ct. at 429. The Supreme Court held that the evidence was insufficient to justify a finding of peonage. *Id.* at 222, 25 S.Ct. at 433. "We have examined the testimony with great care to see if there is anything which would justify a finding of [peonage], and can find nothing. No matter how severe may be the condemnation which is due to the conduct of a party charged with a criminal offense, it is the imperative duty of this court to see that all the elements of

his crime are proved...." *Id.,* 25 S.Ct. at 433.

FN21. In *Clyatt,* the Supreme Court reviewed the constitutionality of Rev. St. U.S. §§ 1990, 5526, which are predecessors to 42 U.S.C. § 1994 and 18 U.S.C. § 1581.

In *Clyatt,* the Court upheld the constitutionality of the predecessors of the Anti-Peonage Act and its criminal sanctions provision. The *Clyatt* Court made a distinction between the statutes when it stated that "Congress has enacted these [statutes] denouncing peonage, and punishing one who holds another in that condition of involuntary servitude." *Id.* at 218, 25 S.Ct. at 431. In this statement, it appears that the Court was distinguishing between the Anti-Peonage Act itself and its criminal sanctions provision. This distinction is further emphasized when the Court acknowledged "the validity of this legislation, [and] its applicability to the case of any person holding another in a state of peonage, and this is whether there be a municipal ordinance or state law sanctioning such holding." *Id.,* 25 S.Ct. at 431. This court interprets that statement to denote that the Supreme Court upholds the constitutionality of the Anti-Peonage Act and its criminal sanctions provision, and further upholds the criminal sanctions provision's "applicability to the case of any person holding another in a state of peonage" whether or not there is a state law or ordinance allowing such conduct. In other words, *Clyatt* appears to stand for the proposition that state action is not required for a criminal proceeding pursuant to 18 U.S.C. § 1581, the criminal sanctions provision of the Anti-Peonage Act. The issue of whether state action is required for a civil proceeding pursuant to 42 U.S.C. § 1994, the Anti-Peonage Act, was not definitively addressed in *Clyatt.*

**\*15** In *Craine v. Alexander,* 756 F.2d 1070, 1074 (5th Cir.1985), the Fifth Circuit held that a plaintiff asserting a claim of peonage must show some state responsibility for the abuse complained of in order to bring the claim.[FN22] "Section 1994 renders invalid only the "acts, laws, resolutions, orders, regulations or usages" of the states that establish or enforce labor as a peon." *Craine,* 756 F.2d at 1074. The Fifth Circuit stated that its conclusion was "buttressed by the Supreme Court's language in *Pollock v. Williams,*" and cited the following language from *Pollock:*

FN22. In *Craine,* a state prisoner brought a

42 U.S.C. § 1983 suit seeking damages for battery against the County, the Sheriff and certain deputies, and the Board of Supervisors of the County Jail.*Craine,* 756 F.2d 1070, 1071 (5th Cir.1985). The plaintiff also sought damages under 42 U.S.C. § 1994, the Anti-Peonage Act, for being subjected to labor. *Id.* The Fifth Circuit held "that no reasonable jury could have found that any 'acts, laws, resolutions, orders, regulations, or usages of [the state],' or even of [the] County, caused Craine to be subjected to labor as a peon."*Id.* at 1074.

Forced labor in some special circumstances may be consistent with the general basic system of free labor. For example, forced labor has been sustained as a means of punishing crime.... But in general the defense against oppressive hours, pay, working conditions or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work. Whatever of social value there may be, and of course it is great, in enforcing contracts and collections of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor. Id. at 1074-75 (citing *Pollack v. Williams,* 322 U.S. 4, 17-18, 64 S.Ct. 792, 799 (1944)).

The *Craine* court concluded "[t]his Congressional policy, even outside the context of a state criminal statute, would have little application unless it is the state that is enforcing the peonage, whether directly or indirectly, as opposed to an individual ."*Craine,* 756 F.2d at 1075. As a second basis for requiring state action, the *Craine* court stated:

Craine asks us to construe § 1994 broadly so as to give him a right of action for damages under § 1983 "without consideration of the perpetrator." He presents us with no convincing plea why we should ignore what Congress chose to make essential. In defining this right as it did, Congress did not choose to abolish usages or customs of individuals that might be likened to conditions of peonage. The remedy for such individual acts lies in the criminal sanction of 18

U.S.C. § 1581 against holding another to a condition of peonage.... We decline to expand the scope of the § 1994 right in direct contravention of legislative expression.

*Id.* at 1075.

This court finds *Craine* dispositive of the issue at hand. *Craine,* relying on *Pollack,* continues where *Clyatt* left off. *Clyatt* upheld the constitutionality of the Anti-Peonage Act and its criminal sanctions provision and indicated that state action is not required for a criminal proceeding pursuant to 18 U.S.C. § 1581. Whereas, *Craine* takes a step further and specifically holds that state action is required for a civil proceeding pursuant to the Anti-Peonage Act. This court finds the Fifth Circuit's holding in *Craine* consistent with a direct reading of the Anti-Peonage Act. The Act completely abolished peonage in its first clause and declared null and void all existing and future state laws and practices which enable peonage to exist in its second. See *Pollack,* 322 U.S. at 8 n. 8, 64 S.Ct. at 795 n. 8. The Act also provides criminal penalties under its separate criminal sanctions provision for individuals holding another in a state of peonage. *See Id.*

**\*16** Accordingly, and for the above reasons, the court finds that allegations of state action are required to state a claim for violation of the Anti-Peonage Act.

The Thirteenth Amendment does not provide plaintiffs with a direct cause of action for either involuntary servitude or peonage.

Count four asserts a claim against all defendants for violation of the Thirteenth Amendment.[FN23] The claim is based on separate allegations of peonage and involuntary servitude, not slavery. Defendants contend that plaintiffs may not bring a claim directly under the Thirteenth Amendment against private actors. This court agrees.

FN23. The Thirteenth Amendment states:
Section 1. Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
Section 2. Congress shall have power to enforce this article by appropriate legislation.

The Supreme Court in the *Civil Rights Cases,*

Case 1:07-cv-00021    Document 25-5    Filed 01/31/2008    Page 23 of 39

Not Reported in F.Supp.2d                                                                 Page 16
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

109 U.S. 3, 20, 3 S.Ct. 18, 28 (1883), stated that the Thirteenth Amendment "is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect it abolished slavery, and established universal freedoms."The Court continued, however, that "[s]till, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit."*Id.*

Plaintiffs contend that a private right of action is available for violations of constitutional rights based on the Supreme Court's holding in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999 (1971) (holding that an action could be brought directly under the Fourth Amendment against a federal official). However, a review of federal case law indicates that the specific issue before this court - whether a plaintiff can bring a claim directly under the Thirteenth Amendment against a private actor -has not yet been thoroughly analyzed by the high court.

The Supreme Court in *City of Memphis v. Greene,* 451 U.S. 100, 101 S.Ct. 1584 (1981), addressed a claim brought against the city and its officials both under 42 U.S.C. § 1982 and directly under the Thirteenth Amendment. The Court confirmed that the Thirteenth Amendment is self-executing and considered the claim brought directly under the Amendment.[FN24]*See id.* at 124,101 S.Ct. at 1598. In its analysis, the Court first determined that the plaintiffs in *City of Memphis* did not have an injury that fell within the reach of § 1982. *Id.* at 124,101 S.Ct. at 1598. The Court then stated, "[w]e therefore must consider whether the street closing violated respondents' constitutional rights."[FN25]*Id.,* 101 S.Ct. at 1598.

FN24. In *City of Memphis,* the plaintiffs claimed the city's decision to close a road connecting a white residential community with a predominantly black area was racially motivated, placed a disparate burden on black citizens, and constituted an unconstitutional badge of slavery.*Id.* at 124, 101 S.Ct. at 1598. Before considering whether plaintiffs' rights under the Thirteenth Amendment had been violated, the Court determined that plaintiffs' injury did "not involve any impairment to the kind

of property interests that we have identified as being within the reach of § 1982."*Id.* The defendants had argued that because the closing did not violate § 1982, which was enacted pursuant to § 2 of the Amendment, "any judicial characterization of an isolated street closing as a badge of slavery would constitute the usurpation of a law making power far beyond the imagination of the amendment's authors."*Id.* The Court addressed defendants' argument stating that "[p]ursuant to the authority created by § 2 of the Thirteenth Amendment, Congress has enacted legislation to abolish both conditions of involuntary servitude and the badges and incidents of slavery. The exercise of that authority is not inconsistent with the view that the Amendment has self-executing force. As the Court noted in *Jones v. Alfred H. Mayer Co.,*... [b]y its own unaided force and effect, the Thirteenth Amendment abolished slavery and established universal freedom."*Id.* (internal quotation marks omitted).

FN25. The Supreme Court did not find that plaintiffs' constitutional rights had been violated. The Court stated, "[t]o decide the narrow constitutional question presented by this record we need not speculate about the sort of impact on a racial group that might be prohibited by the Amendment itself. We merely hold that the impact of the closing ... does not reflect a violation of the Thirteenth Amendment."*Id.* at 128-29,101 S.Ct. at 1601.

At first glance, it may appear that *City of Memphis* stands for the proposition that a court may consider a civil rights claim brought pursuant to the Thirteenth Amendment, and not just a claim brought through "ancillary legislation." In *City of Memphis,* the Supreme Court acknowledged that the Thirteenth Amendment "abolished slavery" and "established universal freedom." *Id.* at 125, 101 S.Ct. at 1599. But, it "left open the question whether Section 1 of the Amendment by its own terms did anything more than abolish slavery,"*id.* at 125-26,101 S.Ct. at 1599, because the Court could not characterize the public action challenged in *City of Memphis* as a badge or incident of slavery. *Id.* at 126, 101 S.Ct. at 1599. More importantly, the Supreme Court never stated specifically that a direct cause of action under the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

Thirteenth Amendment against *private* actors was available. In *Bivens,* the decision to imply a direct action under the Constitution was premised heavily on the fact that federal actors were involved. Like *Bivens, City of Memphis* involved government officials, albeit municipal officials. The present case involves only private actors, and this court finds that to be a crucial distinction. Even though the Supreme Court seems to have acknowledged the existence of a direct cause of action under the Thirteenth Amendment against public actors, this court does not believe *City of Memphis* can be construed so broadly as to also include private actors.

**\*17** Since its 1981 decision in *City of Memphis,* the Supreme Court has not revisited the issue of direct actions under the Thirteenth Amendment. Plaintiffs, however, do cite one case where the Eleventh Circuit recognized a direct cause of action under the Thirteenth Amendment.[FN26] In *Terry Properties, Inc. v. Standard Oil Co. (Ind.),* 799 F.2d 1523, 1536 (11th Cir.1986), the Eleventh Circuit, relying on *City of Memphis v. Greene,* 452 U.S. 955 (1981), stated that a private defendant may be directly liable under the Thirteenth Amendment but affirmed the district court's finding that the defendant lacked the discriminatory intent necessary to sustain a direct claim under the Thirteenth Amendment.[FN27]

> FN26. The Ninth Circuit has not addressed the issue. *See Cato v. United States,* 70 F.3d 1103, 1109 n. 7 and 1110 (9th Cir.1995) (Thirteenth Amendment claim dismissed because of lack of standing and the United States' sovereign immunity; court also stated that *Bivens* had not been extended to actions against government agencies or against the United States).

> FN27. Plaintiffs also cite to two other cases that suggest that a direct cause of action under the Thirteenth Amendment exists: *Channer v. Hall,* 112 F.3d 214, 216 and n. 5 (5th Cir.1997) (INS detainee brought claim for involuntary servitude because he was forced to work in the food service department of the detention center every day; although the court found plaintiff failed to state a claim, the court assumed, *arguendo,* that the claim could be brought directly under the Thirteenth Amendment because § 1 of the Thirteenth Amendment abolishing slavery was self-executing); and

*Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir.1975) (court reversed district court's dismissal of the action on statute of limitations grounds and noted that while the § 1983 claim was barred for other reasons, plaintiff had also alleged claims directly under the Thirteenth and Fourteenth Amendments).

The Court finds that these cases are of little persuasive value. In *Channer,* the Fifth Circuit in its analysis first "... assume[d], *arguendo,* that the Thirteenth Amendment directly gives rise to a cause of action for damages under the analysis articulated in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999 (1971) and its progeny." *Channer,* 112 F.3d at 217. The court next determined whether the actions the plaintiff complained about constituted involuntary servitude. *Id.* In *Channer,* the Fifth Circuit did not directly discuss nor did it rule out whether a direct cause of action exists under the Thirteenth Amendment. The court merely "assumed, *arguendo*" - for the sake of argument or hypothetical illustration - that a cause of action did exist.

Similarly, in *Cox,* the Fourth Circuit did not directly discuss nor did it rule out whether a direct cause of action under the Thirteenth Amendment exists. In affirming in part and reversing in part the decision of the district court, the Fourth Circuit noted that "[t]he district court should not overlook, however, that plaintiff sues directly under the [T]hirteenth and [F]ourteenth [A]mendments, as well as under § 1983." *Cox,* 529 F.2d at 50. It would be far reaching for this court to interpret the Fourth Circuit's statement in *Cox* and the Fifth Circuit's assumption in *Channer* as recognizing a direct cause of action under the Thirteenth Amendment.

However, in the trial courts, where the issue has more often been confronted directly, the weight of authority holds that there is no direct cause of action against private actors under the Thirteenth Amendment: *Del Elmer; Zachay v. Metzger,* 967 F.Supp. 398, 402 (S .D. Cal.1997) (finding that, in the absence of any authority allowing a plaintiff to proceed directly under the Thirteenth Amendment against a private party, plaintiff could not state a claim; the court alternatively found that even if such a claim existed, the facts alleged by plaintiff did not constitute peonage or involuntary servitude); *Holland v. Bd. of Trustees of Univ. of D. of Columbia,* 794 F.Supp. 420, 424 (D.D.C.1992) (no direct cause of action for racial discrimination under the Thirteenth

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Amendment; plaintiff must pursue his remedy through the statutes adopted pursuant to the Amendment); *Roberts v. Walmart Stores, Inc ., 736 F.Supp. 1527, 1528 (E.D.Mo.1990)* (no direct cause of action for racial discrimination under the Thirteenth Amendment; plaintiffs need to base claims on one of the implementing statutes of the Thirteenth Amendment, e.g. 42 U.S.C. § 1981 and § 1982); *Sanders v. A.J. Canfield Co.,* 635 F.Supp. 85, 87 (N.D.Ill.1986) (no direct cause of action under the Thirteenth Amendment for race and sex discrimination against a private employer; plaintiff must resort to the statutory remedies created by Congress under the power granted to it by the amendment).[FN28]

> FN28.*See also Westray v. Porthole, Inc.,* 586 F.Supp. 834, 838-39 (D.Md.1984) (Thirteenth Amendment does not give rise to an independent cause of action for discrimination; plaintiffs must avail themselves of statutory remedies); *Vietnamese Fisherman's Ass'n v. The Knights of the Ku Klux Klan,* 518 F.Supp. 993, 1012 (S .D. Tx.1981) (although Thirteenth Amendment claim was dropped, the court stated that a claim asserting the right to be free from the incidents and badges of servitude against a private party is enforceable through 42 U.S.C. § 1981 and § 1985(3), and not under the Thirteenth Amendment itself); *Clark v. Universal Builders, Inc .,* 409 F.Supp. 1274, 1279 (1976) (court held that § 1982 claim, coupled with the Thirteenth Amendment, did state a claim upon which relief could be based, but dismissed a claim based solely upon the Thirteenth Amendment stating that "[t]hat Amendment simply does not operate in such a manner as to allow an action without implementing statutes such as the Civil Rights Act of 1866.").

The only case cited by the parties that fully analyzed the availability of a direct cause of action against a private actor under the Thirteenth Amendment using the factors set forth in *Bivens* is *Turner v. Unification Church,* 473 F.Supp. 367 (D. R.I.1978). In *Turner,* the plaintiff filed a Thirteenth Amendment claim based on allegations of coercion which resulted in long hours of compulsory service soliciting money and selling items for the Unification Church for which she was not paid. *Turner,* 473

F.Supp. at 370-371. The *Turner* court noted that plaintiff's claim - the right to be free from involuntary servitude - was a federally protected right and the court therefore had the power to imply a cause of action from the Thirteenth Amendment to redress a violation of that interest. *Id.* at 374.However, the court determined that it should not imply such a cause of action because, unlike *Bivens, Turner* only involved private wrongdoings which are traditionally and adequately addressed by state law remedies such as false imprisonment, intentional infliction of emotional distress, and assault and battery, and did not involve the potential for harm that is attendant with a federal officer unconstitutionally exercising his authority. *Id.* The *Turner* court further stated that those state law remedies were not inconsistent with or hostile to the federal interest of protecting individuals from involuntary servitude and, further, implying a direct cause of action under the Thirteenth Amendment based on the conduct of private actors would constitutionalize a large portion of state tort law. *Id.* The *Turner* court also noted that the rights guaranteed by the Thirteenth Amendment are protected through 42 U.S.C. §§ 1981, 1982, 1985(3), and 1994. Therefore, "the implication of a cause of action from the thirteenth amendment appears unnecessary and superfluous."*Id.* This court finds the analysis in *Turner* persuasive and, together with the weight of case law building on *Bivens,* concludes that the more reasoned analysis is that it appears that there is no direct cause of action against private actors under the Thirteenth Amendment. This court recognizes that unlike the Fourth Amendment which applies to federal actors, the Thirteenth Amendment "operat[es] upon the acts of individuals, whether sanctioned by state legislation or not."*Civil Rights Cases,* 109 U.S. at 23, 3 S.Ct. at 30. The weight of authority, however, persuades this court to find that the absence of a clear statement from the Supreme Court whether a direct cause of action under the Thirteenth Amendment against private actors is available and the absence of a governmental actor in the present case is dispositive of the issue at hand.

**\*18** Furthermore, the existence of federal statutory remedies convinces this court that a direct cause of action under the Thirteenth Amendment against a private actor is unavailable. Pursuant to Section Two of the Thirteenth Amendment, "Congress has enacted legislation to abolish both the conditions of involuntary servitude and the 'badges and incidents of slavery.' " *City of Memphis,* 451 U.S. at 125, 101 S.Ct. at 1599. The Supreme Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 19
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.2d)**

has identified those laws as 42 U.S.C. § 1981 ("protects the right of all citizens to enter into and enforce contracts"), § 1982 ("providing broad protection to property rights"), § 1985(3) ("protects blacks from conspiracies to deprive them of 'the equal protection of the laws' "), § 1994 ("which prohibits peonage"), and 18 U.S.C. § 1581 ("which provides for criminal punishment of those who impose conditions of peonage on any person").*Id.* at 125 n. 38,101 S.Ct. at 1599 n. 38. While Congress has enacted civil rights laws under the Thirteenth Amendment, those laws do not specifically provide a remedy for involuntary servitude. Of the statutory remedies, only the Anti-Peonage Act, 42 U.S.C. § 1994, directly addresses a condition akin to involuntary servitude, but requires the additional element of a debt owed to a master. The remaining statutes identified are aimed at the incidents and badges of slavery and do not appear to provide plaintiffs with a remedy for involuntary servitude itself. However, it is not the job of this court to judicially create a cause of action and damage remedy not provided for by the Constitution and not enacted by Congress. The Constitution has vested Congress with the power to legislate. Therefore, the doctrine of separation of powers directs this court not to meddle in the legislation business of Congress. In light of *Turner,* the plaintiffs in this case can look to state law remedies for their involuntary servitude claims. In *Turner,* the court noted that state law remedies such as false imprisonment, intentional infliction of emotional distress, and assault and battery adequately addressed the plaintiff's involuntary servitude claims. *Id.* Such state law claims are not inconsistent with or hostile to the federal interest of protecting individuals from involuntary servitude. "When private wrongdoings can be adequately redressed by state law, there is less compulsion for the judiciary to erect additional constitutional causes of action." *Turner, 473 F.Supp. at 374.* Therefore, based on *Turner,* the interests at stake here may be satisfactorily vindicated by resort to local common law causes of action.

Accordingly, the court finds that a claim for involuntary servitude or peonage is not available to plaintiffs under the Thirteenth Amendment because of the absence of a clear directive from the Supreme Court, the absence of a governmental actor in the present case, and the presence of other adequate remedies, either under federal law or state law, that address plaintiffs' claim. Because the Anti-Peonage Act addresses plaintiffs' claim for peonage, as

discussed below, it is not appropriate to imply an independent cause of action for peonage under the Thirteenth Amendment.

*Plaintiffs do not state a claim for involuntary servitude.*

**\*19** Defendants contend plaintiffs have not stated a RICO claim using involuntary servitude or peonage as predicate acts because the allegations do not show that plaintiffs had no other choice but to labor. The retailer defendants further argue that plaintiffs were not employed by, or owed a debt to, the retailer defendants and thus they cannot state a claim against the retailers.

1. Elements of involuntary servitude.

Plaintiffs have also alleged federal criminal statute violations of involuntary servitude, 18 U.S.C. § 1584, and peonage, 18 U.S.C. § 1581, as RICO predicate acts. In *United States v. Kozminski, 487 U.S. 931, 952, 108 S.Ct. 2751, 2765 (1988),* the Supreme Court determined, with respect to criminal prosecutions, that the use or threatened use of physical restraint, physical coercion or legal coercion to compel labor is required to establish the crime of involuntary servitude.[FN29] The Court specifically declined to include the compulsion of labor through psychological coercion as a form of involuntary servitude because such a subjective standard could criminalize a broad range of day-to-day activities and subject individuals to the risk of arbitrary or discriminatory prosecution and conviction because the statute fails to provide fair notice of the conduct to which one must conform. *See id. at 949-50, 108 S.Ct. at 2763.* The Court further noted that an earlier provision in the statute which created a special distinction for vulnerable victims such as immigrants, children and mental incompetents, had been eliminated. *See id. at 948, 108 S.Ct. at 2763.* "By construing § 241 and § 1584 to prohibit only compulsion of services through physical or legal coercion, we adhere to the time-honored interpretive guideline that uncertainty concerning the ambit of criminal statutes should be resolved in favor of lenity."*Id.* at 952,108 S.Ct. at 2764.

FN29. More specifically, the Supreme Court stated "[a]bsent change by Congress, we hold that, for purposes of criminal prosecution under § 241 or § 1584, the term

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

"involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. This definition encompasses those cases in which the defendant holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion. Our holding does not imply that evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities is irrelevant in a prosecution under these statutes. As we have indicated, the vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve. In addition, a trial court could properly find that evidence of other means of coercion or of extremely poor working conditions is relevant to corroborate disputed evidence regarding the use or threatened use of physical or legal coercion, the defendant's intention in using such means, or the causal effect of such conduct. We hold only that the jury must be instructed that compulsion of services by the use or threatened use of physical or legal coercion is a necessary incident of a condition of involuntary servitude.... We disagree with the Court of Appeals to the extent it determined that a defendant could violate § 241 or § 1584 by means other than the use or threatened use of physical or legal coercion where the victim is a minor, an immigrant, or one who is mentally incompetent."*Id.* at 952-53,108 S.Ct. at 2765.

The Supreme Court in *Kozminski* appeared to recognize that threatened deportation could constitute legal coercion. *See id.* at 948, 108 S.Ct. at 2762 ("it is possible that threatening ... an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude"). The Ninth Circuit also appears to endorse this view. *See Kimes v. United States,* 939 F.2d 776, 778 (9th Cir.1991) (conviction for involuntary servitude based on evidence of physical abuse and threats of deportation was upheld because conviction was based on the requisite physical and legal coercion).FN30

FN30. The Second Circuit in *United States v. Shackney,* 333 F.2d 475 (2nd Cir.1964), also considered whether the threat of deportation constituted legal coercion sufficient to sustain a criminal charge of involuntary servitude. The court held that threatening immigrant workers with deportation does not constitute involuntary servitude. *Shackney,* 33 F.2d at 486. The court stated "[v]arious combinations of physical violence, or indications that more would be used on any attempt to escape, and of threats to cause immediate legal confinement, whether for the escape or some other reason, have also been held sufficient.... But we see no basis for concluding that because the [criminal involuntary servitude] statute can be satisfied by a credible threat of imprisonment, it should also be considered satisfied by a threat to have the employee sent back to the country of his origin, at least absent circumstances which would make such deportation equivalent to imprisonment or worse. A credible threat of deportation might well constitute such duress as to invalidate any agreement made under its influence, as, for example, if on the completion of the Oros' contract Shackney had threatened to have them deported unless they made another; very likely, also, if something was sought or obtained for withdrawing such a threat, the maker could be successfully prosecuted under state blackmail or extortion statutes. But a holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement, in Mr. Justice Harlan's language, 'superior and overpowering force, constantly present and threatening,'... not a situation where the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad. This seems to us a line that is intelligible and consistent with the great purpose of the 13th Amendment; to go beyond it would be inconsistent with the language and the history.... While a credible threat of deportation may come close to the line, it still leaves the employee with a

Case 1:07-cv-00021    Document 25-5    Filed 01/31/2008    Page 28 of 39

Not Reported in F.Supp.2d                                                    Page 21
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

choice, and we do not see how we could fairly bring it within § 1584...."*Id.* at 486.

The *Kozminski* Court concluded "[i]n short, we agree with Judge Friendly's observation [in *United States v. Schackney* ] that "the most ardent believer in civil rights legislation might not think that cause would be advanced by permitting the awful machinery of the criminal law to be brought into play whenever an employer asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful."*Kozminski,* 487 U.S. at 950, 108 S.Ct. at 2763.

**\*20** Accordingly, to establish involuntary servitude as a RICO predicate act, plaintiffs must allege facts to show they were forced to work by the use or threat of physical restraint, physical injury or legal coercion and that they had no other choice. The "special vulnerabilities" alleged by plaintiffs are relevant only in determining whether the physical and/or legal coercion alleged or threats thereof could have plausibly compelled the Class members to work. Plaintiffs must also allege physical and/or legal coercion and that they were left with no other choice but to work. Factual allegations of psychological coercion may be considered in determining whether plaintiffs have sufficiently alleged the required elements. The motion to dismiss is granted but plaintiffs are given leave to amend.

2. Elements of peonage.

The Court also defined peonage as "a condition in which the victim is coerced by threat of legal sanction to work off a debt to the master."*Id.* at 943, 108 S.Ct. at 2760. Peonage was described more fully by the Supreme Court in *Clyatt* which stated:

It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness.... One fact existed universally: all were indebted to their masters. This was the cord by which they seemed bound to their master's service. Upon this is based a condition of compulsory service. Peonage is sometimes classified as voluntary or involuntary; but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsory

service-involuntary servitude. The peon can release himself therefrom, it is true, by the payment of the debt, but otherwise the service is enforced. A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject, like any other contractor, to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service.... That which is contemplated by the statute is compulsory service to secure the payment of a debt."

*Clyatt,* 197 U.S. at 215-16, 25 S.Ct. at 430.

The Court in *United States v. Reynolds* phrased the issue as follows: "[w]e must determine whether the [alleged victim] was in reality working for a debt which he owed the [master], and whether the labor was performed under such coercion as to become compulsory service for the discharge of the debt."*Reynolds,* 235 U.S. 133, 144, 36 S.Ct. 86, 88 (1914).

In order to allege a claim for peonage, there must be a debt owed to the employer and the employer must apply coercion of such a nature that the debtor has no choice but to work off the debt. Based on Supreme Court authority, threats and/or use of physical coercion and/or legal coercion are also required elements of a claim for peonage but the legal ramifications ordinarily attendant with a breach of an employment contract cannot be considered legal coercion resulting in peonage.

Plaintiffs' allegations that their "compulsion to labor" is the result of their debts owed to their employers are sufficient to withstand a motion to dismiss their peonage claim.

**\*21** Although it is a close question, plaintiffs' allegations state a claim for peonage. This is because the alleged compulsion under which plaintiffs labor is not simply the threats and/or use of physical and legal coercion; rather, it includes plaintiffs' fear of the threatened consequences if they are unable to pay their recruitment fee debt, which plaintiffs allege is essentially a debt owed to their employer. Paragraph 9 of the FAC is illustrative of the essence of plaintiffs' contention that they had no other choice

Not Reported in F.Supp.2d                                                                                    Page 22
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

but to work: "they live in constant fear of termination by their employers, which would result in their inability to work, deportation to their home country, and acceleration of the large recruitment fee debt they incurred at the outset of their employment ."

Plaintiffs have alleged threats and use of physical coercion and legal coercion by the manufacturer defendants; however, plaintiffs have not sufficiently alleged that these coercive measures alone robbed them of all choice. Moreover, even accepting as true as the court must the well-pleaded factual allegations of threats and use of physical coercion and legal coercion, the allegations are not of a nature or degree, even given plaintiffs' alleged special vulnerabilities, that it may be reasonably inferred that plaintiffs had *no choice* but to work.[FN31] That plaintiffs made a choice to work, even in the face of the alleged physical and/or legal coercion, is supported by the allegations showing that they repeatedly renewed their one-year employment contracts.[FN32] It is only with the additional consideration of the debt owed to the employer and the consequences of being unable to pay the debt that the allegations suggest that plaintiffs were then robbed of all choice.[FN33]

> FN31. Plaintiffs have alleged several highly coercive circumstances. For example, plaintiffs allege there were physical restrictions in the form of curfews and being restricted to the factory compound. They also allege economic punishment for violations thereof and that financial or physical punishment could also be visited on their families for curfew violations. (FAC ¶ 126). Plaintiffs allege some class members have been subject to false arrest "allegedly at the request of the Contractor Defendants."(FAC ¶ 129). Plaintiffs allege one contractor defendant threatened all his employees with physical retribution and retribution against their families in China if the workers spoke to anyone about conditions. (FAC ¶ 130). Paragraph 129 typifies plaintiffs' factual allegations of physical and legal coercion:

"[t]he Contractor Defendants also cause plaintiffs and Class members to be constantly fearful of harmful physical contact. Plaintiffs and Class members have been repeatedly threatened by armed security guards if attempts are made to leave the factory grounds. Numerous plaintiffs and Class members have been physically threatened during

work hours when the Contractor Defendants' supervisors punished employees for performance or other behavior the supervisors chose to punish. Employees of the Contractor Defendants curse Class members without justification, threaten them with termination or dock their pay, in large part not for legitimate work-related reasons but to ensure continued domination and control over the Class members' lives by reinforcing the message that the Contractor Defendants have absolute power over the Class members. Any appearance of workers standing up for their rights or protesting bad treatment is dealt with harshly; workers are often removed from the factory and penalized with from one to four days time in their barracks without pay, or even fired and placed on a plane and deported to their homeland. The economic consequences of such action makes the Class members economically and psychologically beholden to the Contractor Defendants, because if Class members are terminated, their recruitment fee is not returned or it automatically becomes due and payable and their deposits are forfeited. In repeated instances, Class members have been slapped and physically abused by supervisors employed by the Contractor Defendants. Class members have also been subjected to false arrest by local police, allegedly at the request of the Contractor Defendants, where Class members have been held for 24-36 hours then released with no charges filed. All of these methods of intimidation are designed to ensure that Class members do not protest, dissent or organize during their time in the CNMI garment factories."

This paragraph alleges threats of and use of physical coercion and legal coercion but also shows that the compulsion under which plaintiffs worked was the consequences of being unable to pay their recruitment fee debt.

> FN32. For example, Doe IX has been employed by Top Fashion since 1997 (FAC ¶ 23), Doe X was employed by United International Corp. between 1996 and 1999 (FAC ¶ 24), and Doe XI has been employed by Pang Jin since 1997 (FAC ¶ 25).

> FN33. *See, e.g.,* Paragraphs 122, 129 and 132, for example, shows plaintiffs' compulsion to work based on their debt: "Class members agree to pay a fee ranging from $2,000-$7,000 to the recruiting agency, which fee is paid either prior to departing for the CNMI or paid bi-weekly during the Class members' tenure in the CNMI, with up

to 90% of their bi-weekly salary being paid to the recruiter. Between the repayment of this recruitment fee and the monthly housing and food costs imposed by the Contractor Defendants (which can total up to $2,400 a year), at a minimum wage of $3.05 per hour, repayment of these fees and costs becomes the overriding obligation of each Class member entering the CNMI, establishing the economic bond (and subsequent peonage status) to the Contractor Defendants."

Courts have repeatedly held that the financial consequences attending the quitting of one's job make the choice between continuing to work under adverse conditions and quitting employment an unpleasant choice, but nevertheless a choice.[FN34] However, when the labor is tied to a debt owed to the employer and the employer physically coerces the worker to labor until the debt is paid or the consequences of failing to work to pay off the debt are so severe and outside the customary legal remedy that the worker is compelled to labor, a condition of peonage results, and this is the essence of plaintiffs' allegations.

FN34. See Winthal v. Mendez, 76 Civ. 3161(JMC) 1978 Lexis 1832 (S.D.N.Y. Apr. 18, 1978) ("threats of deportation of future unemployment do not state a claim for involuntary servitude. So long as the servant knows he has a choice between continued service and freedom, he is not working involuntarily."). See also Belefant v. Negev Airbase Constructors, No. 82 Civ. 4598(GLG) 1984 WL 278943, *8 (S.D.N.Y. Jan 13, 1984) (the court stated that "unless a plaintiff alleges that he does not have the option of leaving his job, his claims ... must be dismissed."); Wicks v. Southern Pacific Co., 231 F.2d 130, 138 (9th Cir.1956) ("While leaving their present employment would entail serious losses in terms of seniority rights, medical benefits and retirement benefits, the fact remains that appellants are not being compelled or coerced to work against their will for the benefit of another."); Kaveny v. Miller, No. Civ.A. 93-0218, 1993 WL 298718, *2 (E.D.Pa. July 30, 1993) (plaintiff's claim for involuntary servitude dismissed because he failed to allege the lack of availability of a choice and the complaint's allegations showed in fact that he did have a choice and

an opportunity to leave and that he chose to labor because he did not want his wife and children on the streets); Flood v. Kuhn, 316 F.Supp. 271, 281 (S.D.N.Y.1970), aff'd 443 F.2d 264, 268 (2nd Cir.1971) (baseball's reserve system did not constitute involuntary servitude because although plaintiff's choice not to play for Philadelphia would preclude him from playing baseball at all, it was nonetheless a choice).

Plaintiffs have stated a claim for peonage against the retailer defendants.

At this stage of the proceedings the only question before the court is the sufficiency of the pleadings to withstand a motion to dismiss. Although plaintiffs' have not alleged that they worked for or owed a debt to the retailer defendants, or that the retailer defendants exerted physical or legal coercion to force plaintiffs to work, and plaintiffs' allegations are insufficient to infer a joint venture or agency relationship between the retailer defendants and the manufacturer defendants that would permit vicarious liability to be imposed upon the retailer defendants, they have adequately alleged their conspiracy theory, supra, which may impose liability on the retailer defendants.

## COUNT 5-VIOLATIONS OF INTERNATIONAL LAW

**\*22** Plaintiffs are alleging the torts of forced labor and deprivation of fundamental human rights in violation of international law under the Alien Tort Claims Act ("ATCA"). 28 U.S.C. § 1350.

The ATCA provides that "[t]he district court shall have original jurisdiction of any civil action by an alien for a tort only in violation of the law of nations." Id. In order for a tortious act to be actionable under the ATCA, it must be in violation of an international norm that is specific, obligatory, and universally condemned. Hilao v. Estate of Marcos, 103 F.3d 789, 794 (9th Cir.1996). Defendants contend plaintiffs have failed to state a claim under the ATCA because a violation of international law requires a state actor and the claims are barred by the applicable statute of limitations. The court agrees as to the former assertion and need not consider the latter assertion.

Case 1:07-cv-00021    Document 25-5    Filed 01/31/2008    Page 31 of 39

Not Reported in F.Supp.2d                                                          Page 24
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

Count 5 fails to state a claim for violations of
international law

Although international law generally governs the
relationship between nations, and thus a violation
thereof almost always requires state action, it has
been recognized that a handful of particularly
egregious acts genocide, war crimes, piracy, and
slavery by purely private actors can violate
international law. As of now, however, only the acts
mentioned above have been found to result in private
individuals being held liable under international law.
*See* *Kadic v. Karadzic,* 70 F.3d 232, 240 (2nd
Cir.1995); *Doe v. Unocal Corp.,* 963 F.Supp. 880,
891 (C.D.Cal.1997).

The court has above determined that plaintiffs
have failed to make out a claim for the less egregious
act of involuntary servitude and thus it need not
consider whether the *Unocal* court's equation of
forced labor with slavery is sustainable on the facts as
alleged here. As to plaintiffs' claims of other alleged
human rights violations, no court has yet accepted
plaintiffs' contention that the freedom to associate
and the right to be free from discrimination are
standards that have as yet evolved into norms of
customary international law sufficient to invoke and
be actionable under the ATCA.

Statute of limitations for the ATCA

Plaintiffs contend that the statute of limitations
period under the ATCA should be premised on the
limitations period of the most analogous federal law,
the Torture Victim Protection Act ("TVPA"), which
is ten years. Defendants argue the limitations period
should be borrowed from the most analogous state
law claim.

Because the court has determined that there is no
claim under the ATCA, it need not consider the
question of the appropriate statute of limitations.

No dismissal under Fed.R.Civ.P. 41(b) for improper
joinder

Defendants request that the complaint be
dismissed for improper joinder. Fed.R.Civ.P. 20(a)
permits joinder of defendants only if the alleged right
to relief arises out of the same transaction or series of
transactions and if the claims present questions of
law or fact common to all defendants. Rule 21,

however, states misjoinder is not a ground for
dismissal and defendants' motion is denied.

COUNT 6-COMMON LAW FALSE
IMPRISONMENT

**\*23** At the hearing, the manufacturer defendants
moved to dismiss count six pursuant to the Court's
discretion to decline to exercise supplemental
jurisdiction. A district court has supplemental
jurisdiction over non-federal claims when those
claims and the federal claims derive from a common
nucleus of operative facts, and the claims are such
that a plaintiff would ordinarily be expected to try
them all in one judicial proceeding. *United Mine
Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130,
1138 (1966). The court may decline to exercise
supplemental jurisdiction, however, if one of the
bases enumerated in 28 U.S.C. § 1367(c) is
present,[FN35] and if to decline to exercise jurisdiction
would best accommodate the values of economy,
convenience, fairness and comity. *See* *Executive
Software N. Am., Inc. v. U.S. District Court,* 24 F.3d
1545, 1557 (9th Cir.1994).

> FN35. The bases upon which a court can
> decline to exercise supplemental jurisdiction
> are: (1) the claim raises a novel or complex
> issue of State law; (2) the claim substantially
> predominates over the claim or claims over
> which the court has original jurisdiction; (3)
> the district court has dismissed all claims
> over which it has original jurisdiction; or (4)
> in exceptional circumstances, there are other
> compelling        reasons        for        declining
> jurisdiction. 28 U.S.C. § 1367(c).

Because plaintiffs' claim for false imprisonment
arises from the same nucleus of operative facts as
their federal law claims, and the false imprisonment
claim does not raise novel or complex issues of state
law or substantially predominate over the federal
claims, and there are no other exceptional
circumstances present, the court denies defendants'
motion to dismiss the false imprisonment local law
claim.

CONCLUSION

Defendants' motion to dismiss is granted in part
and denied as set out above.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.2d)

(1) plaintiffs have adequately pleaded § 1962(c) association-in-fact enterprises consisting of individual retailer defendants and individual manufacturer defendants and the motion to dismiss is denied,

(2) a § 1962(c) enterprise consisting of all retailer defendants and all manufacturer defendants has not been sufficiently pleaded, defendants' motion to dismiss is granted, and plaintiffs may amend,

(3) plaintiffs' allegations of lost wages, excessive payments for employer-provided food and lodging, and actual payment of recruiter fees suffice to show "injury to property" for RICO purposes and the motion to dismiss is denied,

(4) plaintiffs' allegations that "deposits" paid to recruiters may not be returned upon the completion of their contracts are too speculative and are insufficient to show "injury to property" for RICO purposes, those claims are dismissed, and plaintiffs may amend if they are able to allege actual losses,

(5) plaintiffs lack standing to seek injunctive relief under RICO and that claim is dismissed with prejudice,

(6) plaintiffs have failed to allege an "investment injury" under § 1962(a), the motion to dismiss is granted, and plaintiffs may amend,

(7) CNMI statutory offenses can be RICO predicate acts,

(8) plaintiffs have adequately alleged violation of 18 U.S.C. § 1581, the federal criminal peonage statute, and 18 U.S.C. § 1951, the "Hobbs Act," as "predicate acts" supporting a "pattern of racketeering activity" under RICO and the motion to dismiss is denied,

(9) plaintiffs have not adequately alleged violation of 18 U.S.C. § 1584, the federal criminal involuntary servitude statute, as a "predicate act" supporting a "pattern of racketeering activity" under RICO, the motion to dismiss is granted, and plaintiffs may amend,

*24 (10) there is no aiding and abetting liability under RICO, defendants' motion to dismiss is granted, with prejudice,

(11) plaintiffs have not sufficiently alleged that the retailer defendants' participation in, or conduct of, the affairs of an enterprise, defendants' motion to dismiss is granted, and plaintiffs are given leave to amend,

(12) plaintiffs have sufficiently pleaded a § 1962(d) conspiracy to violate § 1962(c) and the motion to dismiss is denied,

(13) plaintiffs have failed to sufficiently allege a § 1962(d) conspiracy to violate § 1962(a), defendants' motion to dismiss is granted, and plaintiffs may amend,

(14) neither joint venture nor agency are sufficiently pleaded, defendants' motion to dismiss is granted, and plaintiffs may amend,

(15) civil aiding and abetting is not sufficiently pleaded, defendants' motion to dismiss is granted, and plaintiffs may amend,

(16) civil conspiracy is adequately pleaded,

(17) plaintiffs have not sufficiently pleaded a claim under the Anti-Peonage Act because an allegation of "state action" is required to support such a claim, the claim is dismissed without prejudice, and plaintiffs are given leave to amend,

(18) the Thirteenth Amendment does not provide a direct action for either involuntary servitude or peonage and those claims are dismissed with prejudice,

(19) plaintiffs have not adequately alleged involuntary servitude as a predicate act sufficient for RICO purposes, defendants' motion to dismiss is granted, and plaintiffs are granted leave to amend,

(20) plaintiffs have adequately alleged a "compulsion to labor" common law peonage claim and the motion to dismiss is denied,

(21) plaintiffs have adequately alleged a common law peonage claim against the retailer defendants and the motion to dismiss is denied,

(22) plaintiffs have failed to adequately allege a

Not Reported in F.Supp.2d                                                   Page 26
Not Reported in F.Supp.2d, 2001 WL 1842389 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.2d)**

violation of international law and the motion to
dismiss is granted, without prejudice,

(23) defendants' motion to dismiss under
Fed.R.Civ.P. 41(b) for improper joinder is denied,
and

(24) the court will exercise its supplemental
jurisdiction over plaintiffs' common law false
imprisonment claims because they arise from the
same common nucleus of operative facts.

Unless specifically ordered otherwise, all
dismissals are without prejudice.

Plaintiffs are granted leave to amend consistent
with this Order and shall have twenty days from the
date of this Order to file their second amended
complaint. Defendants have twenty days from the
date of plaintiffs' filing of their second amended
complaint to answer or otherwise respond.

IT IS SO ORDERED.

D.N.Mar.I.,2001.
Doe I v. The Gap, Inc.
Not Reported in F.Supp.2d, 2001 WL 1842389
(D.N.Mar.I.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.)**

Seed v. Hudson
D.N.Mariana Islands,1994.
Only the Westlaw citation is currently available.
District Court for the Northern Mariana Islands.
Terrance Ross SEED, and Randall Seed, Plaintiffs,
v.
Henry HUDSON, personally and in his capacity as
Director, United States Marshals Service, Jose R.
Mariano, personally and in his capacity as United
States Marshal for the Northern Mariana Islands,
Joaquin L.G. Salas, personally and in his capacity as
Deputy United States Marshal, and Gregorio
Camacho, personally and in his capacity as Director,
Department of Public Safety for the Commonwealth
of the Northern Mariana Islands, Defendants.
**No. CIV. A. 93-0008.**

May 11, 1994.

G. Anthony Long, Saipan, MP, for plaintiffs.
Douglas H. Strand, Asst. Atty. Gen., Saipan, MP, for
defendants.

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT

MUNSON, Judge.
   **\*1** This matter comes before the Court on cross
motions for summary judgment by Plaintiffs and by
Defendant Gregorio Camacho.[FN1] For the reasons that
follow, Defendant Camacho's motion for summary
judgment on the issues of the statute of limitations
and qualified immunity is DENIED. Plaintiffs'
motion for summary judgment on the issue of
qualified immunity is GRANTED. Plaintiffs' motion
for summary judgment on the merits is GRANTED
IN PART and DENIED IN PART.

   Plaintiffs were federal pretrial detainees
incarcerated at the Saipan Detention Center, which is
operated by the government of the Commonwealth of
the Northern Mariana Islands ("CNMI"). The United
States Marshals Service contracts with the CNMI to
house its federal prisoners in the CNMI's detention
facilities. Plaintiffs brought suit under 42 U.S.C. §
1983 alleging that the conditions under which they
were held at the detention center violated their
constitutional rights. Plaintiff Terrance Seed's
incarceration at the Saipan Detention Center began
on April 29, 1991. Plaintiff Randall Seed, Terrance's
brother, was incarcerated at the Saipan Detention

Center on May 10, 1991. On May 13, 1991, Randall
was transferred to a facility on Guam, and he was
released from pretrial detention on May 20, 1991.
After a hearing on May 24, 1991, this Court ruled
that certain conditions at the jail violated Terrance's
constitutional rights and ordered that he be released
on bond. He was so released later that day.

*Defendant Camacho's Motion for Summary Judgment*

   Camacho offers two grounds for summary
judgment. First, he contends that Plaintiff Randall
Seed's claims are barred by the two year statute of
limitations applicable to his § 1983 claim. 7
Commonwealth Code § 2503(d); *see* Wilson v.
Garcia, 471 U.S. 261, 276-280, 105 S.Ct. 1938,
1947-49 (1985) (holding that claims brought under
42 U.S.C. § 1983 are subject to the local statute of
limitations applicable to personal injury actions).
Title 7 Commonwealth Code § 2508 provides that if
the defendant is outside of the CNMI when the cause
of action accrues, the statute of limitations is tolled
until the defendant returns to the CNMI. Camacho
claims via affidavit that he was within the CNMI on
May 21, 1991, the date Randall's cause of action
accrued. Plaintiffs point to the December 20, 1993
declaration of Captain Jose San Nicholas, one of
Camacho's subordinates, wherein he stated that
Camacho was not within the CNMI on that date.
Because the record contains conflicting evidence on
that question, there exists a genuine issue of material
fact precluding the entry of summary judgment on
the issue of the statute of limitations.

   As his second ground, Camacho argues that he is
entitled to qualified immunity from this suit. The
Supreme Court in *Harlow v. Fitzgerald,* 457 U.S.
800, 102 S.Ct. 2727 (1982), established a two-part
test to determine whether a public official is entitled
to qualified immunity. First, the court must look to
the applicable law and determine whether the public
official's actions violated a constitutional right that
was clearly established at the time the actions
occurred. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.
The Court has determined that, for the purposes of
Defendant's motion for summary judgment, this first
prong has been met. Second, if the first part is met,
the public official must show that, due to
extraordinary circumstances, he did not know, nor
reasonably should have known, of the relevant legal
standards. *Harlow,* 457 U.S. at 819, 102 S.Ct. at
2739. In other words, "[u]nder th[e clearly
established] law, could a reasonable officer have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 2
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.)**

believed his conduct was lawful?" *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993).

*2 Camacho argues that his conduct was reasonable because his only insight into the relevant standard was a collection of statements and letters from U.S. Marshal Service personnel to the effect that the Saipan jail met all applicable federal standards. This argument misses the mark. The inquiry is not simply whether the conduct was reasonable; rather, the question is whether a reasonable officer, with full knowledge of the relevant legal standard, could believe that his conduct comported with that standard. Camacho contends that his only knowledge of the relevant standard was gleaned from the Marshal Service, and that it was reasonable for him to believe that that was the correct standard. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40 (1987) (holding that qualified immunity should apply to officers who "reasonably but mistakenly conclude" that their conduct was constitutional).

The Ninth Circuit, however, recently held in *Hallstrom v. City of Garden City,* 991 F.2d 1473, 1483 (9th Cir.), *cert. denied, Killeen v. Hallstrom,* 114 S.Ct. 549 (1993), that a law enforcement officer may not rely solely on the opinions of local judicial officers as the basis for his belief as to the relevant legal standard. In *Hallstrom,* the defendants claimed qualified immunity on the basis of two unpublished orders from the same federal district court in which the court granted summary judgment against other plaintiffs asserting similar constitutional claims as the *Hallstrom* plaintiffs. *Hallstrom,* 991 F.2d at 1483. The Ninth Circuit reversed the district court's determination that the defendants had qualified immunity because the district court did not analyze the defendants' actions in light of clearly established Ninth Circuit and Supreme Court law. *Id.* The Ninth Circuit stated:

While at one level it may seem harsh not to allow law enforcement officers to rely on local judicial officers' opinions, the Supreme Court requires what is essentially an artificial test, one that specifically looks to objective, not subjective, reasonableness. A judicial officer's misjudgment will not obviate or excuse another official's obligation to act with *objective* reasonableness. Under the objective test, an official is charged with knowledge of controlling Supreme Court and Ninth Circuit precedent.

*Id.* (citations omitted).

In this case, Camacho claims to have relied not on the opinions of local judicial officers, but rather on the opinions of United States Marshals Service personnel. As the *Hallstrom* case points out, however, Camacho's subjective beliefs as to the clearly established law are not material to the determination of qualified immunity. Under the objective test for qualified immunity, Camacho "is charged with the knowledge of controlling Supreme Court and Ninth Circuit precedent" as to the clearly established law with respect to pretrial detention conditions. *Id.*

*Pretrial Detainees and the Clearly Established Law*

*3 The Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871-72 (1979), ruled that a government can, in accordance with due process, incarcerate an individual charged with a criminal offense prior to conviction so long as the conditions of pretrial detention do not amount to punishment of the pretrial detainee. The confinement conditions of pretrial detainees is thus analyzed under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment's prohibition of cruel and unusual punishment that is applied to convicted prisoners. *Id.* "[W]hile the eighth amendment proscribes cruel and unusual punishment for convicted inmates, the due process clause of the fourteenth amendment proscribes any punishment of pretrial detainees." *Redman v. County of San Diego,* 942 F.2d 1435, 1440 n. 7 (9th Cir.1991), *cert. denied,* 112 S.Ct. 972 (1992).

On the other hand, prison conditions which would constitute cruel and unusual punishment under the Eighth Amendment would, by definition, constitute impermissible punishment under the Fourteenth Amendment. For example, it is clearly established that prison conditions that result in "serious deprivation of basic human needs" or that "deprive inmates of the minimal civilized measure of life's necessities" constitute cruel and unusual punishment. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399 (1981) (citing *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565 (1978); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976)). The Ninth Circuit further instructs that:

In analyzing a challenge to prison conditions under the Eighth Amendment, a court should examine each challenged condition of confinement, such as adequacy of the quarters, food, medical care,

Not Reported in F.Supp.                                                                                              Page 3
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.)**

etc., and determine whether that condition is compatible with "the evolving standards of decency that mark the progress of a maturing society."

*Wright v. Rushen,* 642 F.2d 1129, 1133 (9th Cir.1981) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598 (1958)).

The conditions of which Plaintiffs complain include: (1) denial of a mattress, blanket and pillow; (2) denial of ability to wash clothes; (3) denial of exercise; (4) inadequate lighting; (5) inadequate plumbing; (6) denial of ability to brush teeth; (7) inadequate cell space; and (8) confinement in an area with a convict serving a prison sentence. As discussed below, Camacho does not dispute that Plaintiffs were subjected to each of these conditions. An abundance of Ninth Circuit case law holds that the existence of any one of the first seven of those conditions violates both the Eighth and the Fourteenth Amendments. *See, e.g., Thompson v. City of Los Angeles,* 885 F.2d 1439, 1448 (9th Cir.1989) (denial of mattress, blanket, and pillow); *Spain v. Procunier,* 600 F.2d 189, 199-200 (9th Cir.1979) (denial of outdoor exercise); *Martino v. Carey,* 563 F.Supp. 984 (D.Ore.1983) (inadequate shelter, inadequate plumbing, lack of blankets, sheets, and mattresses, denial of exercise); *Rutherford v. Pitchess,* 457 F.Supp. 104 (C.D.Cal.1978) (inadequate cell space, denial of exercise, inadequate lighting, inability to wash clothes); *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal.1975) (inability to rest comfortably before trial dates, unclean living conditions, inadequate showering facilities); *accord Johnson-El v. Schoemehl,* 878 F.2d 1043, 1054-55 (8th Cir.1989) (unsanitary conditions, inadequate lighting held to be violations of pretrial detainee's clearly established rights); *see generally* Note, *Constitutional Limits on the Conditions of Pretrial Detention,*79 Yale L.J. 941 (1970).

**\*4** Plainly, the law regarding the constitutionality of pretrial detention facilities was clearly established in May 1991. Camacho must show "extraordinary circumstances" [FN2] why he should not be charged with the knowledge that inhumane and indecent prison conditions violate both the Eighth and Fourteenth Amendments in order to show that he "reasonably but mistakenly conclude[d]" [FN3] that the pretrial detention conditions at the Saipan jail were constitutional. He has not made such a showing, and consequently, he is not entitled to qualified immunity. Accordingly, his

motion for summary judgment on that ground is denied.

*Plaintiffs' Motion for Summary Judgment*

Plaintiffs have cross moved for summary judgment on the issue of qualified immunity and on the merits of their claims.

In *Act Up!/Portland v. Bagley,* 988 F.2d 868 (9th Cir.1993), the United States Court of Appeals for the Ninth Circuit addressed the district court's duty when presented with a motion for summary judgment on the issue of qualified immunity. In that case, the court held, contrary to standing Ninth Circuit precedent, that whether a reasonable officer could have believed that his actions were justified under the law is a question of law to be determined by the trial court. The court stated that that question "should be determined by the district court at the earliest possible point in the litigation. Where the underlying facts are undisputed, a district court must determine the issue on a motion for summary judgment." *Act Up!,* 988 F.2d at 873.

As discussed more fully below, the underlying facts regarding the conditions at the jail are undisputed. Also, there is no dispute as to what information Camacho possessed about the jail conditions at the time of Plaintiffs' incarceration. Camacho claims that he believed that the jail met federal standards and therefore met constitutional requirements. Camacho Affidavit of Mar. 21, 1994, at 3, 4. However, his "subjective beliefs" on the subject are "irrelevant." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040. The Court must determine, "in light of clearly established law and the information [Camacho] possessed,"*id.,* whether a reasonable officer in Camacho's position could have believed that the jail conditions were constitutional. In my opinion, no reasonable officer presented with the law and the facts could have believed that the conditions to which Plaintiffs, as pretrial detainees, were subjected were constitutional. Accordingly, Camacho is not entitled to qualified immunity from this suit, and Plaintiffs' motion for summary judgment on that issue is granted.

Turning now to Plaintiffs' motion for summary judgment on the merits, Plaintiffs list eight specific conditions at the jail which they contend were unconstitutional. Plaintiffs complain of: (1) denial of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.)**

a mattress, blanket and pillow; (2) denial of ability to wash clothes; (3) denial of exercise; (4) inadequate lighting; (5) inadequate plumbing; (6) denial of ability to brush teeth; (7) inadequate cell space; and (8) confinement in an area with a convict serving a prison sentence. As evidence that those conditions existed, Plaintiffs offer the transcript of the May 24, 1991 hearing before this Court, including the testimony of Plaintiff Terrance Seed, United States Marshal Phillip Krell, and Captain Jose San Nicholas of the CNMI Department of Public Safety. Plaintiffs also offer the declarations of Defendant Camacho and Vicente T. Seman, Chief of the CNMI Division of Corrections, as well as this Court's Order of May 24, 1991, releasing Terrance Seed. Defendant has presented no evidence contradicting Plaintiffs allegations as to the conditions at the jail. The Court, however, notes that with respect to condition (6), the testimony of Captain San Nicholas at the May 24, 1991 hearing contradicts Plaintiffs' assertions that they were not allowed to brush their teeth daily. Thus, there exists a genuine issue with respect to that claimed condition. Plaintiffs' evidence with respect to the other seven conditions alleged by Plaintiffs remains uncontroverted.

**\*5** Next, the constitutionality of each of those conditions must be examined separately. *Wright, 642 F.2d at 1133*. I find that the first five challenged conditions each constitute a deprivation of a basic human need in contravention of the Fourteenth Amendment. *Thompson v. City of Los Angeles, 885 F.2d 1439, 1448 (9th Cir.1989)* (pretrial detainee's "uncontroverted allegation that he was provided with neither a bed nor even a mattress unquestionably constitutes a cognizable Fourteenth Amendment claim."); *Rutherford v. Pitchess, 457 F.Supp. 104, 117 (C.D.Cal.1978)* ("An inmate must be permitted at least twice per week to receive clean outergarments, undergarments, socks and a towel in exchange for those that he had been using."); *Spain v. Procunier, 600 F.2d 189, 199-200 (9th Cir.1979)* (holding that denial of outdoor exercise constitutes cruel and unusual punishment); *Martino v. Carey, 563 F.Supp. 984, 1000 (D.Ore.1983)* (finding denial of adequate lighting in jail constituted Eighth Amendment violation); *Martino, 563 F.Supp. at 999* ("The provision of adequate means of hygiene, and the sanitary disposal of bodily wastes so that the wastes do not contaminate the cells, are constitutionally required.").

As to cell size, Plaintiffs contend that they were

each confined in a cell measuring six feet by seven or eight feet, i.e., somewhere between 42 and 48 square feet. In *Bell*, the Supreme Court held that double-bunking of pretrial detainees in rooms containing approximately 75 square feet of floor space, or 37.5 feet per detainee, did not amount to punishment under the Fourteenth Amendment. *Bell, 441 U.S. at 543, 99 S.Ct. at 1876*. Consequently, it cannot be said as a matter of law that the cell size in this case is violative of the Constitution.

With respect to Plaintiffs' claim that they were housed in an area with a convicted person serving a prison sentence, Plaintiffs have cited no authority to the Court for the proposition that such a practice is unconstitutional. My own research on the point uncovered two cases reaching opposite results. In *Morales Feliciano v. Hernandez Colon, 697 F.Supp. 37, 45-46 (D.P.R.1988)*, the court found that the conditions in the jail were so intolerable that commingling pretrial detainees with convicted inmates constituted punishment of the detainees in violation of the Fifth and Fourteenth Amendments. Moreover, the court found that because the pretrial detainees were not members of any of the organized prison "gangs" in that jail, their lot was worse than that of the convicts.

In this case, Plaintiffs allege that a convicted rapist serving a 70-year sentence was housed in the same facility as they were. Plaintiffs, however, do not allege any specific injury as a result of that arrangement. For that reason, I find that this case is more like *Martin v. Tyson, 845 F.2d 1451, 1456 (7th Cir.)*, *cert. denied,488 U.S. 863, 109 S.Ct. 162 (1988)*, where the court found that it was not unconstitutional to lodge pretrial detainees with convicted inmates, especially in light of the fact that the plaintiff did not allege that he had been injured as a result of his cell placement. I find that confining Plaintiffs in an area with a convict serving a prison sentence did not violate Plaintiffs' constitutional rights, and it would serve no useful purpose to litigate that particular claim.

**\*6** Finally, I must determine whether Plaintiffs are entitled to summary judgment on their *§ 1983* claim against Camacho in his personal capacity. *Section 1983* requires that the claimant prove: (1) that a person acting under the color of state law committed the conduct at issue; and (2) that the conduct deprived the claimant of some right protected by the Constitution or laws of the United

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)
(Cite as: Not Reported in F.Supp.)

States. _Leer v. Murphy, 844 F.2d 628, 632-33 (9th Cir.1988)._ That Camacho is a person who was acting under the color of state law is undisputed. The issue is whether his conduct led to the alleged constitutional deprivations of which Plaintiffs complain.

As discussed above, pretrial confinement conditions are analyzed under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment's cruel and unusual punishment standard which is used for convicted prisoners. _Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1871-72 (1979)._ That is not to say, however, that "every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." _Bell, 441 U.S. at 537, 99 S.Ct. at 1873._ "[W]e must be cognizant of both the deference accorded to prison officials in their difficult task of managing the security needs of the prison, and the right of the pretrial detainee, once subjected to the normal limitations and conditions that attach to their confinement, to be free from punishment." _Redman, 942 F.2d at 1441._

Prison officials are faced with similar competing interests when dealing with both pretrial detainees and convicted prisoners. In recognition of that fact, the Ninth Circuit has held that the court should use the same standard to determine violations of the Fourteenth Amendment's proscription of punishment of pretrial detainees as it does to determine violations of the Eighth Amendment. _Redman, 942 F.2d at 1442._ The _Redman_ court stated that:

The requirement of conduct that amounts to "deliberate indifference" provides an appropriate balance of the pretrial detainees' right not to be punished with the deference given to prison officials who manage prisons. This standard also comports with the purpose of the due process clause: to protect against deliberate, but arbitrary, choices by government.

We therefore hold that deliberate indifference is the level of culpability that pretrial detainees must establish for a violation of their personal security interests under the fourteenth amendment. We also hold that conduct that is so wanton or reckless with respect to the "unjustified infliction of harm as is tantamount to a knowing willingness that it occur" will also suffice to establish liability because it is conduct equivalent to a deliberate choice. This may be termed "reckless indifference."

_Redman, 942 F.2d at 1443_ (citations and footnotes omitted).

Thus, in order to prevail on this motion, Plaintiffs must show that the uncontroverted facts establish: (1) that Camacho, "in acting or failing to act, was deliberately indifferent to the mandates of the [Fourteenth Amendment] and (2) that [his] indifference was the actual and proximate cause of the deprivation of" Plaintiffs' Fourteenth Amendment rights to be free from any punishment. _Leer, 844 F.2d at 634._

**\*7** As to the first step, the Supreme Court held in _Wilson v. Seiter, 111 S.Ct. 2321, 2324 (1991),_ that the court must inquire into the state of mind of the defendant government official to determine whether or not he was deliberately indifferent to a convicted prisoner's Eighth Amendment rights. The Ninth Circuit in _Redman_ expressly left open the question of whether that same inquiry is required to determine whether an official was deliberately indifferent to the Fourteenth Amendment rights of a pretrial detainee. _Redman,_ 942 F.2d at 1443.

I need not decide that question for the purposes of the instant motion, however, because Plaintiff has not produced any evidence sufficient to meet the second step of the analysis. In other words, Plaintiffs have not proven that Camacho's deliberate indifference, if any, was the actual and proximate cause of their alleged constitutional deprivation. Plaintiffs have simply alleged that the conditions existed and that Camacho knew they existed. A genuine issue of material fact exists as to the causal connection between the complained of conditions at the jail and any act or omission by Camacho performed under the color of state law. Accordingly, summary judgment is not appropriate on that issue.

CONCLUSION

For the foregoing reasons, Defendant Camacho's motion for summary judgment on the issues of the statute of limitations and qualified immunity is DENIED. Plaintiffs' motion for summary judgment on the issue of Camacho's qualified immunity is GRANTED. Plaintiffs' motion for summary judgment on the merits is GRANTED IN PART as to the existence and unconstitutionality of the following conditions of their confinement: (1) denial of a mattress, blanket and pillow; (2) denial of ability to

Not Reported in F.Supp.                                                                           Page 6
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)
**(Cite as: Not Reported in F.Supp.)**

wash clothes; (3) denial of exercise; (4) inadequate lighting; and (5) inadequate plumbing. Plaintiffs' motion for summary judgment as to Defendant Camacho's liability to them under 42 U.S.C. § 1983 is DENIED.

　　　IT IS SO ORDERED.

　　　　　FN1. In an Order dated February 10, 1994, I dismissed the claims against all defendants in their official capacities and against Defendants Hudson and Mariano in their personal capacities. In that Order, I also granted Defendant Salas' motion for summary judgment. Thus, the only remaining defendant is Camacho in his personal capacity.

　　　　　FN2. *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739.

　　　　　FN3. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3030.

D.N.Mariana Islands,1994.
Seed v. Hudson
Not Reported in F.Supp., 1994 WL 229096 (D.N.Mar.I.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.