**O'CONNOR BERMAN DOTTS & BANES**
Second Floor, Nauru Building
1 Nauru Loop
Susupe, Saipan, CNMI
Mail: PO Box 50-1969 Saipan MP 96950
Phone: 234-5684
Fax: 234-5683
E-mail: **attorneys@saipan.com**

**Attorneys for Plaintiff**

**IN THE DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | | |
|---|---|---|
| **AE JA ELLIOT PARK,** | ) | Civ. No. 07-0021 |
| | ) | |
| Plaintiff, | ) | **OPPOSITION** |
| | ) | **TO MOTION TO DISMISS** |
| vs. | ) | **SECOND AMENDED** |
| | ) | **COMPLAINT** |
| **JARROD MANGLOÑA, et al.,** | ) | |
| | ) | Date: April 10, 2008 |
| Defendants. | ) | Time: 8:30 am |

### Introduction

Plaintiff Ae Ja Elliot Park has asserted various claims in this matter against the CNMI Department of Public Safety and several of its officers (hereinafter collectively "the Government"), arising out of their failure to investigate the circumstances of the auto accident in which she was struck and injured by a drunk driver, Norbert Babauta.

The Government's motion to dismiss the First Amended Complaint was granted without prejudice. Accordingly, Plaintiff filed a Second Amended Complaint. The Government has now moved to dismiss that as well.

As in the case of the original Motion to Dismiss, the Government's argument is principally directed against Ms. Park's equal protection and due process claims. The motion should be denied, because, for the reasons set forth herein, Ms. Park does state a viable civil rights claim for both denial of equal protection and denial of due process.

## Ms. Park States a Claim For Denial of Equal Protection

The Government does not dispute the principle, stated in <u>DeShaney v. Winnebago County Dep't of Social Services</u>, 489 U.S. 189, 197 n.3 (1989), and numerous subsequent cases,[1] that a state may not "selectively deny its protective services to certain disfavored minorities." It simply denies that police investigation of crime, or arrest of perpetrators, fall within the meaning of the term "protective services."[2]

---

[1] *See, e.g.*, <u>Estate of Macias v. Ihde</u>, 219 F.3d 1018, 1028 (9th Cir. 2000) ("There is a constitutional right . . . to have police services administered in a nondiscriminatory manner -- a right that is violated when a state actor denies such protection to disfavored persons."); <u>Navarro v. Block</u>, 72 F.3d 712, 715-17 (9th Cir. 1996) (recognizing § 1983 claim based on discriminatory denial of police services); <u>Balistreri v. Pacific Police Department</u>, 901 F.2d 969, 701 (9th Cir. 1990) (recognizing viability of claim that "police failure to respond to complaints lodged by women in domestic violence cases may violate equal protection," reversing denial of motion to amend § 1983 complaint to state such a claim); <u>Hayden v. Grayson</u>, 134 F.2d 449, 452 (1st Cir. 1998) ("[A]lthough there is no constitutional right to police protection, State executive and law enforcement officials may not selectively deny protective services to certain disfavored minorities.") (quoting <u>DeShaney</u>).

[2] The Government, again, repeatedly mischaracterizes Ms. Park's claim as being solely for the arrest of Babauta. See Motion to Dismiss at 4 ("failure to arrest"), 5 ("Ms. Park's entire claim boils down to an alleged failure to arrest"); 8 ("she was denied an arrest and prosecution"); 8 ("Ms. Park is angry that Defendant Babauta was not arrested"); 9 ("Ms. Park conflates 'arrest' with police protection"); 10 ("she did not receive the 'benefit' of having somebody else arrested"); 14 ("a generalized grievance: the DPS Defendants failed to arrest Babauta"); 14 ("she has only alleged that Babauta was not arrested"); 14 ("the failure to arrest an individual"); 17 ("no protected interest in having a third party arrested"); 18 ("her disappointment and unhappiness that DPS officers failed to arrest a drunk driver").

These characterizations of the complaint may usefully be contrasted with what the complaint actually says. See, e.g., Second Amended Complaint at ¶ 30 ("failed to conduct any field sobriety tests, or do anything else to verify if Babauta was intoxicated or not"); ¶ 32 ("failed to conduct any field sobriety tests or blood alcohol tests on him, or otherwise investigate whether he was intoxicated"); ¶ 38 ("neither Doe 1 nor Defendant Manglona conducted field sobriety tests or blood alcohol tests on him, or otherwise investigate whether he was intoxicated"); ¶ 44 ("chose not to perform any sobriety test, or otherwise properly investigate Babauta's intoxication"); ¶ 49 ("never charged Babauta with driving under the influence"); ¶ 50 ("falsely . . .stated in his report of the accident that Babauta 'had not been drinking'"); ¶ 52 ("performed a field sobriety test to ascertain the driver's level of intoxication, and arrested that driver"); ¶ 53 ("failing to investigate or arrest

1    It is evident from a survey of the relevant case law, however, that this is incorrect. For
2    example, in Roman v. City of Reading, 257 F.Supp. 799 (E.D. Pa. 2003), a black man's car had been
3    shot at while he was driving through the streets of Reading, and he, spotting a police car nearby,
4    sought the officers' assistance. After substantial delay, an officer finally spoke with the man, but
5    took no evidence from the car, and apparently took no further action, remarking casually that "there
6    are a lot of shootings in that part of town." Id. at 801. The victim brought a Section 1983 action
7    against the city, and the court, while it dismissed his due process claim, upheld his claim for
8    violation of equal protection. In that claim:

> He 'maintains that from the very beginning, when the Reading Police Department saw him to be a black man or a man of color, the crime committed against him was handled differently . . . . The officers assumed that the Plaintiff was either a drug dealer or a pimp, and that there was no need for a formal *investigation* because it would confirm the racist concept of blacks killing blacks.' He further alleges that 'if the Plaintiff was a white man or woman,' *the police response and investigation* would have proceeded more aggressively.

Id. at 803 (emphasis added) (internal punctuation omitted). The equal protection claim, in other words, was solely and explicitly grounded in racially-based failure to investigate. The court quoted the rule of DeShaney that "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the equal protection clause," and found that:

> This appears to be exactly the gravamen of Plaintiff's allegations: that Defendants, pursuant to a 'policy' of racial discrimination, denied him *protective services* based on his race, and treated him differently than they would have a person of a different race.

---

Babauta"); ¶ 56 ("why Babauta had not been arrested, or at least given a field sobriety or blood alcohol test"); ¶ 59 ("obstruct the investigation, and to prevent the prosecution of Babauta"); ¶ 68 ("[t]he investigation of crime and the arrest of criminal offenders"); ¶ 69 ("the investigation of crime and the arrest and prosecution of criminal offenders"); 70 ("failing to investigate or arrest Babauta, and obstructing the subsequent investigation"); ¶ 80 ("failed to make a good faith preliminary determination whether a crime had been committed"); ¶ 82(c) ("secure statements and other information which will aid in the successful completion of the investigation"); ¶110 ("a duty to follow basic police procedures in investigating traffic accidents").

   The discrepancy means, among other things, that the Government's standing argument, which relies entirely on the claim that Plaintiff alleges only a non-arrest, and "hasn't alleged that she was denied the protective services of the police regarding accident investigations," Motion to Dismiss at 14, is based on false premises.

3

Id. at 803 (emphasis added). "Investigation" is thus treated by the court as a type of "protective services," to the point that the allegations of the complaint are found to fit "exactly" within the rule of DeShaney.

Likewise in Hawk v. Perillo, 642 F.Supp. 380 (E.D. Ill. 1986), two black men had been assaulted by a group of white men outside a restaurant in Chicago. When the police arrived, they spoke privately with some of the assailants, who promptly fled. The officers did not order them to stop, and gave only belated and half-hearted chase, allowing the white men to escape. They also "did not interview anyone at the scene of the attack." Id. at 382. The black victims brought a civil rights action, charging that the officers, "*by their post attack inaction*," id. (emphasis added), violated their civil rights, including equal protection. Their complaint, in other words, was *not* that the police had failed to protect them from the crime in the first instance, but rather (as in Roman and as in this case) that it discriminated against them in their *investigative response* to the crime after the fact. The Court upheld the claim against the officers' motion to dismiss, writing:

> [T]his court interprets plaintiffs complaint as alleging that the Police Defendants failed to act because plaintiffs are black. These allegations state a claim under Section 1983 of violations of the plaintiffs' Fourteenth Amendment right to equal protection.

Id. at 384. Similarly in Smith v. Gilpin County, Colorado, 949 F.Supp. 1498 (D. Colo. 1996), a black man brought a Section 1983 equal protection case against the county sheriff's department and some of its officers, alleging that the department had failed to investigate various crimes committed against him, and had done so discriminatorily based upon his race. For example, there had been several assault cases in which the department:

> did not issue an all points bulletin for the cars described or the people involved and did not do a lineup although Smith [the victim] gave them good investigative leads and had documented injuries. [However,] all points bulletins were put out in other assault cases involving white persons.

Id. at 1502. The court denied defendants' motion to dismiss, again citing the DeShaney rule that, "although there is no general constitutional right to police protection, the police may not

4

discriminate in providing such protection." Id. at 1500. The court, in other words, again found "investigation" to be within the scope of "protection" for purposes of this rule.

The foregoing cases demonstrate that "police protection" does *not* mean *only* protection from a crime before it occurs. Post-crime responsive functions such as investigation and arrest *are part of* DeShaney "protective services," in the provision of which the state may not discriminate on the basis of race. Accordingly, discriminatory failure by police to investigate, arrest, or otherwise respond to a crime, as alleged in this case, does give rise to a viable Section 1983 claim by the victim of the crime for deprivation of equal protection.[3]

The reason for this can be found in the historic background of the civil rights laws. As the Government itself admits, these laws arise out of the experience of 19th-century Reconstruction. See Motion to Dismiss at 10 ("Equal protection cases are founded on the troubled history of this nation. The equal protection clause in particular and the 'Civil War Amendments' in general were designed to end the caste system designed by states that had been in rebellion."). As the court in Hawk noted, "the police Defendants actions [failing to act against whites who had assaulted blacks] are *precisely the type of actions* that motivated Congress to pass Section 1983." Hawk, supra, 642 F.Supp. at 384 (emphasis added). Recalling the origins of Section 1983 in the Reconstruction era, the court noted that the civil rights law was directly motivated by "the failure of certain States to enforce the laws with an equal hand," necessitating a federal remedy against state officials who "were *unable* or *unwilling* to enforce a state law." Id. (*quoting* Monroe v. Pape, 365 U.S. 167 (1961)) (emphasis in

---

[3] It is possible to put too much emphasis on the DeShaney language "protective services" or "police protection," and to derive from this a sense that protection from immediate physical harm is the only area to which equal protection applies. It is well to remember that the actual constitutional right being vindicated is to "the equal protection of the laws," and it strains reason to maintain that any person's "protection of the laws" does not include the investigation of crime committed against him or her, or that the victim of the crime that goes uninvestigated has no more interest in the matter than any member of the general public. (*Cf.* Motion to Dismiss at 14)

5

original)). The court in Smith likewise took note of the "circumstance surrounding the passage of § 1983, including the concern for protecting Negroes from the widespread non-enforcement of state laws." Smith, supra, 949 F.Supp. at 1500 (*quoting* Smith v. Ross, 482 F.2d 33 (6th Cir. 1973)).[4] *See also, e.g.*, Mody v. City of Hoboken, 758 F.Supp. 1027, 1028 (D.N.J. 1991) ("An express or implied policy which permits or condones attacks upon members of a particular minority group is the very evil which the post-Civil War statutes sought to eradicate. If law enforcement turns away from a victim solely because of the victim's race, religion, or national origin, equal protection of the laws is rendered meaningless.").[5]

The Government's cited cases do not hold the contrary. The Government's argument relies principally on two cases: Barnes v. Black, 2004 WL 257105 (W.D. Wis.) (See Motion at 6-7), and Cravens v. City of La Marque, 2006 WL 492805 (S.D.Tex.) (See Motion at 7). Neither of these cases holds that investigation or arrest is categorically outside the scope of police protective services. On the contrary, both were decided on the ground that they involve no allegation of disparate treatment. In Barnes, the court noted:

---

[4] The court, moreover, described the law in this area as "clearly established," so as to defeat a claim of qualified immunity. Id. at 1500, 1508.

[5] The plaintiff in Mody had alleged a pattern of police "not detaining or filing criminal complaints against those who attacked [East] Indians." Id. at 1032. Ultimately, his claim failed based on failure of proof of discriminatory intent, see Mody v. City of Hoboken, 959 F.2d 461, 467 (3rd Cir. 1992), but the court did not question the legal basis of the claim, or the idea that "detaining" persons and "filing criminal complaints" against them is a part of "police protection." *See* id. at 466 ("We assume that discriminatory denial of police protection on the basis of race constitutes a violation of section 1983.").

Similarly, the court in Moua v. City of Chico, 324 F.Supp.2d 1132 (E.D.Cal. 2004), in which Hmong plaintiffs alleged that the city discriminatorily delayed filing felony charges against a person harassing them, granted summary judgment for the defendants based on lack of evidence of discriminatory intent. *See* id. at 1139-41. It found no fault with the issue as such, analogizing it, without distinction, to the same "failure-to-serve" line of cases relied on by Plaintiff in support of her claim in this case, including Navarro v. Block, 72 F.3d 712 (9th Cir. 1995), Balistreri v. Pacifica Police Dept., 901 F.2d 969 (9th Cir. 1988), and Hayden v. Grayson, 134 F.3d 449 (1st Cir. 1998).

6

> Construing the allegations liberally, petitioner's complaint does not suggest any way in which he has been treated differently from similarly situated individuals.

2004 WL 257105 at *2. Similarly in Cravens, the court pointed out:

> There are no facts in the Complaint to support and equal protection violation. There are no facts supporting an inference that the decision not to arrest Cravens was based on race. There are no facts showing or even alleging that similarly situated individuals of other groups outside Cravens' class were arrested under the same circumstances, nor are there any fats to support any inference of purposeful discrimination on the part of Officer Ontiveros. Plaintiffs have failed to allege any facts supporting any theory of racial discrimination, bias, or prejudice, or that race had anything to do with Officer Ontiveros's decision not to arrest Cravens.

2006 WL 492805 at *8. Thus, it was the lack of any allegation of unequal treatment that defeated the equal protection claims in those cases, not the fact that a failure to investigate or arrest was involved. It is at least implicit in these cases that, had discrimination been alleged, the claims would have survived.

Moreover, it need hardly be said that neither of these cases provides any support whatsoever for the Government's repeated attempts to suggest that there is a special rule for *traffic accident* cases. See Motion to Dismiss at 5 ("police protection does not include investigation and arrest after a traffic accident"); id. at 5-6 ("Quite simply these types of police protection cases do not apply to Ms. Park's traffic case."); id. at 6 ("Ms. Park's cause of action does not involve police protection. It is a traffic case, and similar traffic cases demonstrate that Ms. Park has no claim."); id. at 7-8 ("Even if, however, this court were to find that 'police protection' applies in cases involving traffic accidents . . . "). True, Barnes and Cravens both involved traffic accidents, but that fact is never remarked upon by either court as having any bearing whatsoever on the reasoning or the decision. In fact, it is a pure coincidence, no more relevant to their respective holdings than the fact that both cases arose in the Central Time Zone, or that in both cases the names of the plaintiff and defendant begin with the same letter of the alphabet.[6]

---

[6] Barnes also raises an issue of lack of injury, thus lack of standing, and appears to be cited by the Government for that point as well. See Motion to Dismiss at 6-7. See also id. at 14-15

1  The Government also contends that Ms. Park "received the benefits of police protection,"
2  citing example of various things that she alleges the officers did at the scene of the accident. Motion
3  to Dismiss at 8. The elephant in the room on this argument, however, is what the officers did *not*
4  do – namely, investigate Norbert Babauta for intoxication. The Government cited case, Lunini v.
5  Grayeb, 395 F.3d 761 (7th Cir. 2005), provides a useful contract. In that case, officers called to the
6  scene of an alleged assault and battery, spoke with the man who claimed to have been assaulted, and
7  noticed that he was bleeding. They also spoke with the alleged assailant, who denied any assault
8  and had no blood on him. They looked through the house and found "no physical evidence of an
9  altercation." They finally concluded that there was insufficient evidence of whether a crime has
10 been committed. Id. at 764. It is difficult to point to anything more the police in Lunini could have
11 done. In this case, by contrast, it is easy to do so. Tellingly, Lunini has been distinguished as a case
12 in which police performed an adequate investigation, but decided not to make an arrest, as opposed

---

(raising a similar standing argument). On this issue, however, Barnes overlooks the fact that a violation of constitutional right is an injury in and of itself:

> A plaintiff may prove a violation of § 1983 without demonstrating that the deprivation of his or her constitutional rights caused any actual harm. In this circuit, nominal damages must be awarded if a plaintiff proves a violation of his or her constitutional rights. The trier of fact must award nominal damages to the plaintiff as a symbolic vindication of her constitutional right. Thus, the Appellants may prevail on their claim and receive at least nominal damages if they can prove that the Appellee's violated Mrs. Macias's right to equal protection, irrespective of whether the Appellees' conduct caused Mrs. Macias's death.

Estate of Macias v. Ihde, 219 F.3d 1018, 1028 (9th Cir., 2000) (citations and internal punctuation omitted) (*quoting* George v. City of Long Beach, 973 F.2d 706, 708 (9th Cir. 1992), and Floyd v. Laws, 929 F.2d 1390, 1403 (9th Cir. 1991)). *See also, e.g.*, Floyd v. Laws, 929 F.2d 1390, 1401-1402 (9th Cir. 1991) (noting also that the same rule applies regardless of whether the rights infringed were procedural or substantive); Draper v. Coombs, 792 F.2d 915, 921-22 (9th Cir. 1986) (same holding); Larez v. City of Los Angeles, 946 F.2d 630, 640 (9th Cir. 1991) ("[I]t was appropriate to proceed . . . for the purpose of vindicating those constitutional rights, through the awarding of nominal, yet symbolic, damages"). *See generally* Carey v. Piphus, 435 U.S. 247, 266-67 (1978) ("the denial of procedural due process should be actionable without proof of actual injury").

The court in the recent case of Ndaula v. Holliday, 2007 WL 1098954 (W.D.La. 2007), succinctly reconciles Carey with Barnes' main authority, Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), as follows: "The violation of a constitutional right constitutes an 'actual injury.'" Id. at *6 fn. 2.

to a case where police "allegedly refused to take the first step of issuing a police report or investigating the charges to see if any of the claims had merit." Whitehouse v. Piazza, 397 F.Supp.2d 935, 940 (N.D. Ill. 2005). This case is of the later type.

The Government's motion to dismiss Ms. Park's equal protection claim, and any of her other claims that depend on the viability of the equal protection claim, should therefore be denied.

**Ms. Park States a Claim For Denial of Due Process**

The existence of a claim for denial of due process requires that existing law have created either a liberty or a property interest to which Ms. Park was entitled, but which was denied to her. "Stated simply, 'a State creates a protected liberty interest by placing substantive limitations on official discretion.'" Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 462 (1989) (quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983)). A property interest is created by state law which establishes a benefit to which a person has "a legitimate claim of entitlement." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972) (citing Goldberg v. Kelly, 397 U.S. 254 (1970)).

The Court dismissed Ms. Park's previous due process claim on the ground that the Victim's Bill of Rights does not create a truly mandatory duty, since it requires only the officer's "best efforts," an imprecise term leaving room for much discretion, similar to the term "every reasonable means," which was found not truly mandatory in Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005). Order at 5-7. The Court also noted that "an entitlement to procedure" does not support a due process claim. *Cf.* Castle Rock at 764 (noting that "the seeking of an arrest warrant" is only procedure, and does not create an entitlement); Dix v. County of Shasta, 963 F.2d 1296, 1300 (9th Cir. 1992) (a law that creates a procedure, but does not require a particular result, does not create an entitlement). In renewing her due process claim, however, Ms. Park has clarified that the "best

9

efforts" required by the Victim's Bill are not mere "procedure" toward an unspecified result; they are themselves the result that is required. The "procedure" to reaching them lies in the preliminary good faith determination whether a crime has been committed, and thus that there is a "victim of crime" in the first place. See Second Amended Complaint at ¶¶ 78-80.

Ms. Park has also cited numerous other laws and regulations of the CNMI that impose mandatory duties on law enforcement officers. See Second Amended Complaint at ¶ 82. The Government argues against the mandatory character of these laws and regulations on various grounds, but its arguments are unpersuasive. For example, the Government argues that 1 CMC § 2504 imposes duties only on the Department, not on individual officers. See Motion at 12. However, the Department can act only through its officers, so any duty of the department is thus necessarily a duty of its officers. That is evident from Plaintiff's next citation, to 6 CMC § 3202. Under this law, an individual officer can be prosecuted for "willfully neglect[ing] to perform the duties of his or her office as provided by law." *See, e.g.*, Commonwealth v. Kaipat,. 2 N.M.I. 322, 332-33 (1991); Commonwealth v. Pangelinan, 2 C.R. 839, 851 (App. Div. 1989) (both holding that a police officer is a public official within the ambit of this law). If the law imposes no duties on individual officers, but only on "the Department," then who can be prosecuted for misconduct in public officers? The existence of this criminal law also serves to illustrate the mandatory character of the other duties cited. An officer has no discretion to willfully neglect to perform the duties of his office, since doing so can subject him to criminal liability. Even otherwise discretionary acts cannot be done for a willful and corrupt purpose without violating the law – or, to put the same thing another way, there is no discretion to so do them. See, e.g., Commonwealth v. Bellis, 440 A.2d 1179, 1181 (Pa. 1982) (offenses of misfeasance, malfeasance, or nonfeasance in office "involve either the breach of a positive statutory duty or the performance by a public official of a discretionary act with an improper and corrupt motive."); State v. Egan, 287 So.2d 1 (Fla. 1973) ("Where, however, the duty which has not been performed is one involving discretion, the failure

1  to perform it is not per se an indictable offense in the absence of willful and corrupt motives."). It
2  can therefore be said that any duty, the breach of which by an officer is sufficient to subject him to
3  prosecution for misconduct in public office is also sufficiently "mandatory" to subject him to civil
4  liability for denial of due process to the persons toward whom those duties were owed. The
5  breaches alleged in the Second Amended Complaint are of that character.

7  Finally, the Government argues that the numerous sections of the DPS regulations cited by
8  Plaintiff only create interests or duties among the officers themselves, "not general members of the
9  public." Motion to Dismiss at 13-14. It is certainly true that *some* of the DPS regulations do not
10 concern the general public. Others, by contrast – such as those relied by Plaintiff – *do* concern the
11 general public very directly. The Government's suggestion that there will be a flood of litigation
12 over officers failing to keep their uniforms "neat, clean and well pressed" is as foolish as it sounds,
13 as it rests on the assumption that neither officers, litigants, nor courts will be able to tell the
14 difference. *Cf.* State v. Hess, 301 S.E.2d 547, 550-51 (S.C. 1983) ("The existence of a duty owed
15 to the public is essential [to a charge of official misconduct], for otherwise the offending behavior
16 becomes merely the private misconduct of one who happens to be an officer.").

18 If, however, the Court is inclined to hold that none of these laws and regulations impose
19 mandatory duties on DPS officers, Plaintiff again requests that it certify that question to the CNMI
20 Supreme Court. Otherwise, the motion to dismiss the due process claim, and all other claims
21 depending upon it, should be denied.

### Ms. Park States a Claim For Conspiracy

24 Again, as in its original Motion to Dismiss, the Government raises the additional issue of the
25 "heightened pleading" standard for civil rights conspiracy claims under 42 U.S.C. § 1985. The
26 Court did not reach this issue in its previous Order, so Plaintiff reiterates the substance of her

11

1  original argument.

The continued vitality of this "heightened pleading" standard has recently been called into doubt. In Jones v. Tozzi, 2006 WL 2472752 at *13 (E.D.Cal. 2006), the court pointed out that any heightened pleading standard for civil rights conspiracy claims was difficult if not impossible to reconcile with Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125-26 (9th Cir. 2002) (per Schroeder, C.J.), which held that "heightened pleading of improper motive in constitutional tort cases" is not required, and overruled prior cases holding the contrary. The Jones court concluded that, if the "heightened pleading" standard still exists at all, it "should be applied liberally." 2006 WL 2472752 at *13.

Even if its still applies in its original formulation, however, the "heightened pleading" standard for conspiracy is nevertheless "not intended to be difficult to meet." Harris v. Roderick, 126 F.3d 1189, 1195 (9th Cir. 1997). This is so because:

> it serves the limited purpose of allowing the district court to dismiss 'insubstantial' suits prior to discovery and allowing the defendant to prepare an appropriate response, and where appropriate, a motion for summary judgment based on qualified immunity.

Id. (quoting Branch v. Tunnell, 937 F.2d 1382, 1386 (9th Cir. 1991)). The "heightened pleading" standard can be met by allegations of "either direct or circumstantial evidence" of unlawful intent. Id.

It is met in this case by the allegations of overwhelming circumstantial evidence that Babauta was drunk, including his physical appearance (¶ 27 ("Babauta was teetering, slurring his words, reeked of alcohol and had bloodshot eyes.")); his statement to police (¶ 29 (that he had "blacked out" while driving)); and the observations of at least seven different witnesses (¶¶ 36-37, 40-42, 57 (Plaintiff, her husband, Dr. Austin, Mark Williams, the fireman, the tow truck driver, and a CHC nurse)), in combination with the evidence that all three of the named officers on the scene, as well

12

as officer Doe 1, had the opportunity to observe first hand and at close range the obviously intoxicated condition of Babauta; but that, despite this, none of them took any of the ordinary steps to gather further evidence of his intoxication. *See* Second Amended Complaint at ¶¶ 30, 32, 38. It is further supported by the allegations that Defendant Manglona made false statements in his report, and that Defendant Macaranas incongruously took proper investigative steps with respect to another accident the same night. Id. at ¶¶ 50, 52. And it is further supported by the allegation and that other Doe officers, who were supposed to be investigating the original failure to cite Babauta, subsequently attempted to intimidate and harass Dr. Austin into recanting his statement that Babauta was drunk. Id. at ¶ 58.

A conspiracy is by its nature secretive, and Ms. Park cannot reasonably be expected to know, at this point, exactly who said what to whom in forming the conspiracy. The circumstantial evidence available to her and alleged in the complaint, however, fairly points to the conclusion that a conspiracy to let Babauta off the hook did in fact exist.

**Conclusion**

Because Ms. Park has stated viable claims for violation of civil rights by denial of equal protection of the laws and due process of law, and has also met the applicable standard for pleading a conspiracy to violate her civil rights, the Government's motion to dismiss the complaint in this matter should be denied in its entirety.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Plaintiff

By:_____/s/_____
             Joseph E. Horey

13

*3268-01-080314-PL-M to dismiss-OPP (2).wpd*